IN RE C.R.; CUYAHOGA COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES ET AL., APPELLANTS; CROWDER, APPELLEE.

[Cite as *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191.]

(No. 2004–2031—Submitted September 20, 2005—Decided March 29, 2006.)

O'DONNELL, J.

{¶ 1} The Eighth District Court of Appeals has certified the following question to us after determining that its decision conflicts with other appellate courts: "Whether, before awarding legal custody to a nonparent, a trial court must first find the noncustodial parent unsuitable when a child has been determined to be abused, neglected or dependent." For the reasons that follow, we answer that question in the negative.

Factual and Procedural History of the Case·

{¶ 2} The history of this case reveals that Susan Reust has had a long-standing relationship with Jesse Crowder and has given birth to two of their children who are in the legal custody of his mother, Patricia Brannan. In October 2000, while drug-dependent, Susan gave birth to his third child, a daughter, C.R. Although Susan and Crowder had engaged in sexual relations in early 2000, Susan had denied her pregnancy to him and had claimed that she could not become pregnant due to poor health. While pregnant, however, she admitted to his mother that Jesse had fathered the baby. Subsequently, Crowder learned for himself that Susan had delivered C.R.

{¶ 3} Thereafter, in July 2001, the Cuyahoga County Department of Children and Family Services ("CCDCFS") filed a complaint in juvenile court alleging C.R. to be a neglected child, further alleging that Susan had a substance-abuse problem, and naming the child's father as "John Doe." An accompanying affidavit for publication sought the identity and location of C.R.'s father.

{¶ 4} After a probable-cause hearing, the juvenile court removed C.R. from her mother's care and placed her in the temporary custody of Clifford and Stephanie Reust, Susan's brother and sister-in-law.

{¶ 5} In September 2001, when Crowder suspected his paternity but had not yet confirmed it, he began to receive notices from the court of the child-neglect proceedings involving C.R. Crowder's attorney filed a notice of appearance on September 24, 2001, and on the same day filed a motion seeking legal custody of C.R. and a request for the court to order genetic testing. Crowder confirmed his paternity of the child in November 2001. At various pretrial hearings, the magistrate found that notice requirements had been met and that all necessary parties were present in court, including Crowder. Eight months later, in July 2002, the juvenile court finally adjudicated C.R. to be a neglected child.

{¶ 6} On October 15, 2002, the juvenile court began a three-day dispositional hearing on competing motions for legal custody of C.R. filed by her father, Jesse Crowder, her aunt and uncle, Stephanie and Clifford Reust, and her grandmother, Patricia Brannan. Instead of scheduling three consecutive hearing days, however, the court heard the second day of testimony on November 21, 2002, and the third on December 10, 2002. (See Code of Judicial Conduct, Canon 3(B)(8) requiring a judge to dispose of all judicial matters promptly.) It is a disservice to litigants and lawyers when judges or magistrates do not conduct trials and hearings on consecutive days. Delays caused by such failure are unwarranted, and no excuse justifies concluding this three-day dispositional proceeding on December 10, 2002, given that it began on October 15, 2002. Nonetheless, a review of the record indicates that following the hearing, the magistrate made the following findings: "Father's demeanor during trial indicated he has not been

committed to [the older two children] in the past and his present demeanor show[s] *less than vigorous* desire to take legal custody of [C.R.]." (Emphasis added.) Further, the magistrate noted, "[i]f the child was granted into the legal custody of dad it is questionable if father or [Patricia] Brannan would raise the child." And "[i]f the child was moved from [Clifford and Stephanie Reust] she could face confusion and/or loss of security and stability. This risk is not justified when the child is presently placed in a loving home which meets all the child's needs." In addition, the magistrate noted that "after an extensive investigation, [guardian ad litem] Ristity recommends the best interest of [C.R.] would be served by granting legal custody of [C.R.] to Clifford and Stephanie Reust." The juvenile court thereafter awarded legal custody of C.R. to Clifford and Stephanie Reust.

{¶ 7} Crowder appealed that judgment, and the court of appeals reversed, with one judge dissenting, and held that the juvenile court should have made a separate finding of unsuitability as to the father before it awarded legal custody to a nonparent. The dissenting opinion, however, emphasized that there is no requirement that a trial court make an explicit finding of parental unsuitability before awarding legal custody to a nonparent in neglect cases, and it further emphasized that the evidence demonstrated that it was in the child's best interest to remain in the custody of Clifford and Stephanie Reust.

## Certification of Conflict

{¶ 8} The court of appeals has certified a conflict between its decision and that of other appellate districts[1] and seeks resolution on the following limited question: In a case in which a juvenile court has adjudicated a child to be abused, neglected, or dependent, is the court also required to make a separate determination of parental unsuitability as to each parent at the dispositional hearing before awarding legal custody to a nonparent? We answer that question in the negative.

{¶ 9} CCDCFS urges that a juvenile court is required to make only a best-interest-of-the-child finding at the dispositional hearing and not an explicit unsuitability determination of a parent when a child has been adjudicated abused, neglected, or dependent. It maintains that an unsuitability finding is required only in private custody cases that do not involve abused, neglected, or dependent children.

---

1. The conflict cases are as follows: *In re D.R.*, 153 Ohio App.3d 156, 2003-Ohio-2852, 792 N.E.2d 203 (Summit County); *In re T.W.*, Summit App. No. 21594, 2003-Ohio-7185, 2003 WL 23094939; *In re Gales*, Franklin App. Nos. 03AP–445 and 03AP–446, 2003-Ohio-6309, 2003 WL 22785029; *In re Farrow*, Franklin App. No. 01AP–837, 2002-Ohio-3237, 2002 WL 1377798; and *In re Osberry*, Allen App. No. 1–03–26, 2003-Ohio-5462, 2003 WL 22336115.

{¶ 10} Stephanie and Clifford Reust argue that an adjudication of neglect implies a determination of parental unsuitability. Further, they maintain that at the dispositional hearing, the court has a duty to focus on the care, protection, and development of the child—in other words, the child's best interest.

{¶ 11} Contrariwise, Crowder asserts that the law requires the juvenile court to find each parent unsuitable before it awards custody to a nonparent in an abuse, neglect, or dependency case. Further, he stresses that a parent's fundamental right to raise his or her child should not be taken away by implication and that it is unfair for a parent to be penalized for the neglect by the other parent.

{¶ 12} R.C. 2151.23(A)(1) specifies that the juvenile court has exclusive original jurisdiction concerning children alleged to be abused, neglected, or dependent. In addition, R.C. 2151.23(A)(2) grants jurisdiction to the juvenile court "to determine the custody of any child not a ward of another court of this state." However, as we earlier pointed out in *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 15, this statute does not articulate a standard for the juvenile court to apply when making such custody determinations.

{¶ 13} At the outset, it is important to note that this is not a case involving permanent custody of C.R., but rather concerns a grant of only legal custody.

{¶ 14} R.C. 2151.011(B)(30) defines "permanent custody" as "a legal status that vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, including the right to consent to adoption, *and divests the natural parents* or adoptive parents *of all parental rights, privileges, and obligations, including all residual rights and obligations.*" (Emphasis added.)

{¶ 15} R.C. 2151.011(B)(19) defines "legal custody" as "a legal status that vests in the custodian *the right to have physical care and control* of the child and to determine *where and with whom the child shall live,* and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, *all subject to any residual parental rights, privileges, and responsibilities.*" (Emphasis added.)

{¶ 16} In addition, R.C. 2151.011(B)(52) defines "temporary custody" as "legal custody of a child who is removed from the child's home, which custody may be terminated at any time at the discretion of the court * * *."

{¶ 17} In this case, at the adjudicatory hearing, the juvenile court awarded only legal custody of C.R. to Stephanie and Clifford Reust. The important distinction is that an award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities. See R.C. 2151.011(B)(19) and *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 8, fn. 1.

In the future, then, in this case, either parent may petition the court for a modification of custody. Id. at ¶ 36.

## Hockstok, Perales, and Cunningham

{¶ 18} *Hockstok* did not involve an abused, neglected, or dependent child and arose from a private custody dispute originating in the domestic relations court pursuant to R.C. 3109.04. There, we said: "[A] trial court must make a parental unsuitability determination on the record before awarding legal custody of the child to the nonparent." *Hockstok,* 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, syllabus.

{¶ 19} *Hockstok* relied on *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047, which also did not involve an abused, neglected, or dependent child, but arose from a private custody dispute in juvenile court pursuant to R.C. 2151.23(A)(2). In *Perales,* we held that in a child-custody proceeding between a parent and nonparent, a court may not award custody to the nonparent "without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." Id. at syllabus.

{¶ 20} Furthermore, *In re Cunningham* (1979), 59 Ohio St.2d 100, 106, 13 O.O.3d 78, 391 N.E.2d 1034, did involve a *dependent* child, and we stated that after a dependency adjudication, a finding of parental unfitness is not a mandatory prerequisite to an award of *permanent* custody. Id. at 102, 13 O.O.3d 78, 391 N.E.2d 1034. (Emphasis added.)[2] There, we noted that, at that time, no statutory requirement necessitated a finding of parental unfitness as a prerequisite to an award of permanent custody in cases where a child is adjudged abused, neglected, or dependent. Id. at 103, 13 O.O.3d 78, 391 N.E.2d 1034.

{¶ 21} Unlike *In re Cunningham,* the instant case does not involve an award of permanent custody and concerns a grant of only legal custody, which does not divest parents of residual parental rights, privileges, and responsibilities. However, as in *In re Cunningham,* no statute requires a finding of parental unfitness as a prerequisite to an award of legal custody in cases where a child is adjudged abused, neglected, or dependent.

---

2. Subsequent to our decision in *Cunningham,* the General Assembly revised the statutory framework for a juvenile court in making *permanent* custody determinations. See R.C. 2151.353(A)(4) and 2151.414(B) through (E). Therefore, considering the new statutory framework set forth by the General Assembly, *Cunningham,* although not squarely on point, is instructive in this case.

## Conclusion

{¶ 22} After reviewing *Hockstok, Perales,* and *Cunningham* and the applicable statutes, we agree with the appellate courts that have concluded that abuse, neglect, or dependency adjudications implicitly involve a determination of the unsuitability of the child's parents.[3]

{¶ 23} A juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of the unsuitability of the child's custodial and/or noncustodial parents. It does not, however, permanently foreclose the right of either parent to regain custody, because it is not a termination of all residual parental rights, privileges, and responsibilities, and therefore a motion for a change of custody could be filed in a proper case in accordance with law. See R.C. 2151.42.

{¶ 24} For these reasons, we conclude, as the majority of appellate districts that have considered the issue have concluded, that when a juvenile court adjudicates a child to be abused, neglected, or dependent, it has no duty to make a separate finding at the dispositional hearing that a noncustodial parent is unsuitable before awarding legal custody to a nonparent.

Judgment accordingly.

MOYER, C.J., O'CONNOR and LANZINGER, JJ., concur.

RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., dissent.

———————————

PFEIFER, J., dissenting.

{¶ 25} In *In re Hockstok,* 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 18, this court stated, "[A] finding of parental unsuitability has been recognized by this court as a necessary first step in child custody proceedings between a natural parent and nonparent." To the contrary, in this case, we hold in paragraphs one and two of the syllabus that an adjudication that a child is abused, neglected, or dependent is an implicit finding that both natural parents are unsuitable. This implicit determination is too sweeping and does not allow the trial judge discretion to determine that a noncustodial natural parent is suitable.

———————————

3. See, e.g., *In re Johnson* (Mar. 29, 1995), 4th Dist. No. 94CA2003, 1995 WL 146064, *4; cf. *In re D.R.,* 153 Ohio App.3d 156, 2003-Ohio-2852, 792 N.E.2d 203 (Summit County); *In re T.W.,* Summit App. No. 21594, 2003-Ohio-7185, 2003 WL 23094939; *In re Gales,* Franklin App. Nos. 03AP–445 and 03AP–446, 2003-Ohio-6309, 2003 WL 22785029; *In re Farrow,* Franklin App. No. 01AP–837, 2002-Ohio-3237, 2002 WL 1377798; and *In re Osberry,* Allen App. No. 1–03–26, 2003-Ohio-5462, 2003 WL 22336115.

{¶ 26} *Hockstok* also stated, "[T]he overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children. *Santosky v. Kramer* (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599; *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. This interest is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution; *Santosky*, supra; *In re Shaeffer Children* (1993), 85 Ohio App.3d 683, 689–690, 621 N.E.2d 426. Since parents have constitutional custodial rights, any action by the state that affects this parental right, such as granting custody of a child to a nonparent, must be conducted pursuant to procedures that are fundamentally fair. *Santosky v. Kramer*, 455 U.S. at 754, 102 S.Ct. 1388, 71 L.Ed.2d 599; *In re Adoption of Mays* (1986), 30 Ohio App.3d 195, 198, 30 OBR 338, 507 N.E.2d 453.

{¶ 27} "Ohio courts have sought to effectuate the fundamental rights of parents by severely limiting the circumstances under which the state may deny parents the custody of their children. *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047, syllabus." *Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16–17.

{¶ 28} These constitutional rights exist whether a child has been adjudicated neglected (as in the case before us) or whether the case involves a parentage action (as in *Hockstok*). Id. at ¶ 18. Despite the plain and obvious language of *Hockstok*, the majority opinion doesn't even acknowledge that Jesse Crowder has constitutional custodial rights.

{¶ 29} At the time of the initial transfer of custody to the Reusts, Crowder did not know that C.R. was his child. Because of this, Crowder likely did not have notice of the probable-cause hearing and did not have an opportunity to be heard at it. Although the issue is not squarely before us, it is of significance to our decision. "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge* (1976), 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18, quoting *Joint Anti–Fascist Refugee Commt. v. McGrath* (1951), 341 U.S. 123, 171–172, 71 S.Ct. 624, 95 L.Ed. 817 (Frankfurter, J., concurring). Although Crowder could be held to his common-law and statutory duty to provide for C.R.—see *Haskins v. Bronzetti* (1992), 64 Ohio St.3d 202, 203, 594 N.E.2d 582, and R.C. 3103.03—according to the majority, when his child was adjudicated neglected, his constitutional rights transmogrified into "residual rights," even though his behavior did not contribute to the adjudication of neglect. Furthermore, the magistrate used the initial award of custody against Crowder when he stated that C.R. "could face confusion and/or loss of security and stability [if legal custody were taken from the Reusts and awarded to Crowder]. This risk is not

justified when the child is presently placed in a loving home which meets all the child's needs." Crowder's constitutional rights to custody of his natural child have not been appropriately considered at any stage of the proceedings.

{¶ 30} The magistrate in this case wrote that Crowder "has a stable and appropriate home, and a good job. He has complied with all the expectations of Children and Family Services regarding [C.R.]." Even so, I cannot tell from the record whether Crowder would be a suitable parent for C.R. It is possible that C.R.'s placement with the Reusts is the best possible placement for her. I hope that it is, given that the Reusts have custody of her. I am concerned about the far-reaching impact of this case and the negative effect it will have on noncustodial parents seeking custody of their natural children. I do not believe that a parent should lose a custody battle to a nonparent absent a determination that the parent is unsuitable. See *Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971. I would answer the certified question in the affirmative. I dissent.

RESNICK and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

---

William D. Mason, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, for appellant Cuyahoga County Department of Children and Family Services.

Dale F. Pelsozy, for appellants Clifford and Stephanie Reust.

James H. Schulz, for appellee.