DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Thomas H., has appealed from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor child, G.H., and placed her in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.
 I {¶ 2} G.H., born August 8, 2006, is the child of Thomas H. ("Father") and Amber R. ("Mother"). LCCS had previously been involved with the family based largely on concerns of unsanitary conditions and poor parenting skills. The present case began in November 2006 based on the same continuing concerns. At that time, G.H. and a half-sibling were residing with Mother and several other family members. Father had lived with Mother in the past, but was not living in the home when the present case began. Also, his paternity of G.H. had not yet been established. Initially, the children remained in the home and the agency attempted to assist in *Page 2 
remedying these conditions. On December 14, 2006, LCCS made an unannounced home visit and observed extremely unsanitary and unsafe conditions. According to the allegations in the complaint, the caseworker observed a moldy baby bottle, a strong odor of urine from the bathroom and one bedroom, a filthy bathroom, stairs piled with "junk" and two prescription medicine bottles, laundry all over the floor, and dead bugs on the floor. G.H. was in a bassinet with a blanket tucked by her face and a propped-up baby bottle, though Mother had repeatedly been told not to do so due to safety and suffocation risks. Both children were in need of medical care and the family was in the process of being evicted. LCCS filed a complaint in the juvenile court and alleged that both children were neglected and dependent. Emergency temporary custody was awarded to the agency.
 {¶ 3} In due course, the trial court adjudicated both children as neglected and dependent and awarded temporary custody to LCCS. Case plans were developed for Mother, Father, and the father of the half-sibling. On December 12, 2007, LCCS moved for permanent custody. Following a hearing on the question of the custody of both children, the trial court granted LCCS's motion for permanent custody. Father has timely appealed and has assigned two errors for review. Mother is not a party to this appeal. This appeal does not address the post-judgment status of G.H.'s half-sibling.
 II Assignment of Error I "THE TRIAL COURT'S TERMINATION OF APPELLANT'S PARENTAL RIGHTS WAS NOT BASED ON CLEAR AND CONVINCING EVIDENCE IN VIOLATION OF R.C. 2151.414(B)." *Page 3 
 Assignment of Error II "THE TRIAL COURT'S TERMINATION OF APPELLANT'S PARENTAL RIGHTS WAS NOT IN THE BEST INTEREST OF THE MINOR CHILD PURSUANT TO R.C. 2151.414(D)."
 {¶ 4} Father has argued that the trial court's finding that permanent custody is in the best interest of G.H. is not supported by clear and convincing evidence. Father has also argued that the evidence presented on two of the statutory best interest factors does not support this finding.
 {¶ 5} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95,99.
 {¶ 6} The trial court concluded that these children had been in the temporary custody of an appropriate agency for twelve or more months of a consecutive 22-month period, pursuant to R.C. 2151.414(B)(1)(d). This finding was erroneous. The children were removed from their home on December 14, 2006. For purposes of R.C. 2151.414, these children are considered to have entered the temporary custody of the agency 60 days thereafter. See R.C. 2151.414(D). In order to satisfy the statutory requirements of R.C. 2151.414(B)(1)(d), the children must have been in the temporary custody of an agency for 12 months of a consecutive 22-month period *Page 4 
before the motion for permanent custody is filed in reliance on that factor. In re C. W., 104 Ohio St.3d 163, 2004-Ohio-6411, at ¶ 26. The agency's motion for permanent custody was filed on December 12, 2007. Consequently, R.C. 2151.414(B)(1)(d) may not be relied on in satisfaction of the first prong of the permanent custody test in this case.
 {¶ 7} The trial court also found that G.H. could not be placed with either parent within a reasonable time or should not be placed with their parents. See R.C. 2151.414(B)(1)(a). In support of that determination, the trial court found that the parents had not remedied the conditions that caused the children to be placed outside of the home. See R.C. 2151.414(E)(1). Because the trial court made an appropriate alternative finding, the first prong of the permanent custody test was satisfied by the alternative finding.
 {¶ 8} Father has not contested this finding. He has challenged only the best interest finding. When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 "(5) Whether any of the factors in divisions (E) (7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5). *Page 5 
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 9} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. In re D.A.,113 Ohio St.3d 88, 2007-Ohio-1105, at ¶ 12. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." In re Adoption ofHolcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 10} The first best interest factor requires consideration of the relevant personal interactions and interrelationships of the children. Teresa Jones, the LCCS caseworker, testified that Father interacted appropriately with his daughter when he attended scheduled visitations, but also indicated that he had not established a bond with the child. She explained that Father delayed in establishing his paternity and that, thereafter, he was very inconsistent in attending visitation and had participated in only 12 of 66 scheduled visits. According to the caseworker, Father first attempted to excuse his poor attendance with claims that he was working or attending GED classes at the time when visits were scheduled. When Ms. Jones requested Father's work and class schedules so that visitation could be rescheduled, Father reportedly stated that he was not coming to visits because "he didn't want to deal with the agency. He would bond with his child when she came home."
 {¶ 11} Initially, Father was not cooperative with the agency and its service providers. When the agency began the present case in November 2006, it attempted to place the children in *Page 6 
a "safety plan" with Father. Father refused when he learned that the agency would have to come to his home. By spring 2007, Father offered to cooperate with the agency. He established paternity in June or July 2007 and began GED classes in October 2007, but failed to accomplish much else. He made four appointments to complete a substance abuse assessment and cancelled all four appointments. He did not complete the assessment until the day after the permanent custody hearing began. The assessor reportedly recommended that Father participate in an intensive outpatient program from March 2008 until September 2008. Father refused all but two requests for drug screens, and those two test results were positive for marijuana. By way of a response, Father attempted to argue that the use of marijuana was not illegal. In court, he admitted that he has continued to use marijuana. Father did not verify any employment to the caseworker as she requested. He did not complete parenting classes, a mental health assessment, or an anger management assessment.
 {¶ 12} Mother was unable to provide a suitable home for G.H. She did not have stable housing, stable income, or an ability to provide for the basic needs of her child. There were concerns regarding Mother's mental health and substance abuse. She obtained assessments in both areas, but failed to follow through with the treatment recommendations. Mother has attended some parenting classes and has been assisted in parenting by other service providers, but she has been unable to implement good parenting skills and has not demonstrated a positive bond with her children. Mother attended approximately two-thirds of the scheduled visits, and her visits were said to be "extremely chaotic." According to reports, she spent most of her time on her cell phone and little time interacting with her children in a positive manner. The case aide said Mother would push the children away from her. The case aide testified that Mother needed help with even basic parenting skills, such as diapering and feeding, and that Mother did not *Page 7 
provide proper supervision for the children. The aide was often forced to intervene because Mother would let things get "out of control." According to the caseworker, Mother was very negative. She yelled and screamed at her children and constantly argued over the telephone. Despite efforts to work with Mother on parenting skills, no improvement was observed.
 {¶ 13} The maternal grandfather and his wife visited G.H. on a monthly basis. Their visits were good, with love and bonding. Mother's sister, Ashley, attended some visits, and she appeared to have a good relationship with G.H., as well. In addition, the children were doing well in foster care and were bonded with their caregiver.
 {¶ 14} The guardian ad litem recommended that the agency should be granted permanent custody of G.H. and her half-sibling. The guardian also recommended that G.H. and her half-sibling should be placed together in an adoptive home because their relationship has been the only constant in their lives. The custodial history of G.H. reveals that she was 19 months old at the time of the permanent custody hearing, and that she had been in foster care for all but the first four months of her life.
 {¶ 15} As to the fourth best interest factor, there was evidence before the trial court that G.H. was in need of a legally secure permanent placement, but that neither parent was able to provide such a placement for G.H. In addition, there were no suitable friends or relatives willing to provide for her care. G.H. was doing well in foster care, but the foster mother was not willing or able to adopt her. The caseworker testified that G.H. and her half-sibling were young, healthy, and developmentally on target and that there would be no difficulty in placing them together in an adoptive home.
 {¶ 16} Father has argued that LCCS has not explored all available relatives for placement. The agency had requested names of relatives for placement when the case plan was *Page 8 
first established and names were provided at that time. The caseworker explored those individuals and reported that none of the named relatives was able to provide a suitable placement based upon refusals by the relatives, lack of income to meet the needs of a child, or their own previous involvement with children services. Father proffered several more names shortly before the permanent custody hearing. The caseworker investigated those relatives as fully as time allowed and found no relatives suitable for placement. It is not reasonable, however, to expect an agency to conduct a matter as complex as child placement and home study at the last moment, particularly where a request for the names of relatives was made by the agency — and pursuant to court order as part of the case plan — at the very outset of this case. Father's argument lacks merit.
 {¶ 17} Next, Father has pointed to the fact that he has three other children in his care and that the agency found his home to be acceptable and the children to be clean and fine. Father has argued that if he can adequately provide for those children, there cannot be a finding of unsuitability or incapacity to provide adequate care for G.H. The issue raised in this appeal, however, is not Father's suitability. That question was, in fact, resolved upon adjudication. See In re C.R.,108 Ohio St.3d 369, 2006-Ohio-1191, at paragraph two of the syllabus. The issue before the Court in this appeal is the best interest of G.H. pursuant to the statutory factors in R.C. 2151.414(D)(1)-(5). A review of the evidence presented to the trial court on those factors, as set forth above, supports the judgment of the trial court. Moreover, it is somewhat perplexing that Father has now argued that he is able to provide good, stable, and loving care for G.H. when he did not even establish paternity for nearly a year and then visited this very young child only 12 times in the course of nearly eight months. *Page 9 
 {¶ 18} Father has also argued that he was not able to attend the scheduled visits because of his class schedule and that this should not be held against him. The caseworker testified otherwise, however, stating that Father delayed in conveying his schedule to her so that other arrangements for visitation could be made. The caseworker also testified to remarks made by Father that revealed a general lack of appreciation for the seriousness of the legal process and a lack of commitment to his child. As stated above, the caseworker testified that Father told her that he was not attending visits because he would bond with the child after she came home and also that he did not want to deal with the agency. In addition, when G.H. was initially removed from Mother's care and Father had an opportunity to participate in a "safety plan" for her, he declined.
 {¶ 19} Finally, Father has argued that two of the best interest factors weigh in his favor: the child's interrelationship with him and whether the child can have a legally secure permanent placement other than through an award of permanent custody. In regard to the first factor, the evidence does not support Father's claim. The caseworker testified that there was no bond between Father and G.H. given the small number of visitations that Father attended. Father disputes the caseworker's ability to draw this conclusion, but, instead, has credited Mother's testimony in support of his claim of a bond. In attempting to establish that Father had a good relationship with G.H., however, Mother is not a credible witness. As detailed above, Mother was universally described as having very poor parenting skills and a poor relationship with her children. In addition, Mother admitted that she had lied to the caseworker when she believed it would help her case. The record does not support Father's argument that this factor weighs in his favor. *Page 10 
 {¶ 20} Father has also relied on In re Lay (1987), 43 Ohio App.3d 78, in support of his argument on the first best interest factor.Lay does not support Father's position, either legally or factually. First, the General Assembly amended R.C. 2151.414 in 1988 Am. Sub. S.B. No. 89 (effective 1-1-89) and Lay no longer provides applicable authority for the requirements of an award of permanent custody. In reCulver (June 23, 1999), 9th Dist. No. 19285, at *2, fn. 1. Second, Father's argument is grounded on an assertion that he was as bonded to his child as was the parent in Lay, and an assertion that he could provide adequate parental care for his child. The factual record does not support this claim. The Lay court found that there was a "strong bond" between the father and his son. Lay, 43 Ohio App.3d at 81. The court specifically found that the father made "every effort to be the best father he [could] be," that he benefited from the services provided and had shown "a marked improvement." Id. at 82. As demonstrated above, Father in the present case can point to no similar evidence.
 {¶ 21} Father has argued that the evidence on the fourth best interest factor weighs in his favor because the agency had not researched all potential relative placements or the possibility of the foster mother assuming legal custody of G.H. Father has claimed that the agency was obligated to research every alternative placement and that there must be clear and convincing evidence that permanent custody was the "only alternative" for the trial court. That, however, is not the current state of Ohio law. The Ohio Supreme Court has stated that R.C. 2151.414(D)(4) is but one of the best interest factors that the trial court must consider and weigh in determining the best interest of the child, and that R.C. 2151.414(D) does not require the court to weigh one factor more heavily than other factors. In re Schaefer,111 Ohio St.3d 498, 2006-Ohio-5513, at ¶ 64. Furthermore, the Ohio Supreme Court emphasized that, in considering a motion for permanent custody, a trial court is not obligated to find that permanent custody is the only *Page 11 
available option, nor must the trial court conclude that there is clear and convincing evidence that no suitable relative was available for placement before granting such a motion. Id. Father's argument is, therefore, without merit.
 {¶ 22} Moreover, there was no evidence in the record to suggest that the foster family was able or willing to assume legal custody of G.H. Father has failed to cite any authority that would allow the trial court to grant legal custody to an individual who had not requested such a placement. R.C. 2151.353(A)(3), as amended September 21, 2006, requires a written request by or on behalf of the proposed legal custodian and, if the request is made by one other than the proposed custodian, a detailed "statement of understanding" of the legal custody placement signed by the proposed legal custodian. Because the foster mother had filed no motion for legal custody, nor had any party requested a legal custody placement with an accompanying statement of understanding, the trial court had no authority to consider placing G.H. in the legal custody of the foster mother. See In re M.A., 9th Dist. No. 23690,2007-Ohio-4655, at ¶ 18.
 {¶ 23} Father has not demonstrated any error by the trial court in granting permanent custody of G.H. to the agency. Father's two assignments of error are overruled.
 III {¶ 24} Father's two assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
 The Court finds that there were reasonable grounds for this appeal. *Page 12 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
 SLABY, P. J., DICKINSON, J., CONCUR *Page 1