[Cite as *In re K.S.*, 2015-Ohio-3814.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# SENECA COUNTY

IN RE:                                               CASE NO. 13-15-11

    K.S.,

DEPENDENT CHILD.                                     **O P I N I O N**

[JONATHAN FLOREA - APPELLANT]

**Appeal from Seneca County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 21350058**

**Judgment Affirmed**

**Date of Decision:  September 21, 2015**

APPEARANCES:

    *Jessica L. Monday* **for Appellant.**

    *Tiffany F. Fruth* **for Appellee.**

**WILLAMOWSKI, J.**

{¶1} Appellant Jonathan Florea ("Jonathan")[1] brings this appeal from the judgment of the Common Pleas Court of Seneca County, Ohio, Juvenile Division, which granted legal custody of his daughter, K.S., to Christie Cole ("Christie"), and overruled his motion for custody and motion for removal of K.S. from the care of Christie.  For the reasons that follow, we affirm the trial court's judgment.

*Factual and Procedural Background*

{¶2} K.S. is the daughter of Jonathan and Megan Smith ("Megan").  Upon her birth, K.S. was adjudicated a dependent child and Christie has been providing custody for K.S. since K.S. was released from the hospital.  Christie also provides custody for K.S.'s older brother, D.S.  The Seneca County Department of Job and Family Services ("the Department"), conducted protective supervision of K.S. and established a case plan, which had a goal of reunification of K.S. with the parents.  Until April 2014, at the hearings on the matter before the trial court, both parents expressly consented to the temporary custody of K.S. by Christie under the Department's supervision.  Jonathan had visitations with K.S.

---

[1] We note that two different spellings of the appellant's first name appear throughout the record.  While the notice of appeal, appellate briefs, and the final judgment entry spell his name as "Jonathan," multiple other filings and judgment entries use the alternative spelling of "Jonathon."  (*Compare, e.g.*, R. a 23, 47, 118, *with* R. at 1, 13, 45.)  In this opinion we elect to spell the name as it appears in the final judgment entry and in the appellate filings before us.

{¶3} In August 2014, the Department filed a motion to grant Christie legal custody of K.S. In October 2014, Jonathan filed a motion for legal[2] custody and a motion for removal from Christie's care. Megan did not request custody. After the final hearing on the matter,[3] the trial court overruled Jonathan's motions and granted legal custody of K.S. to Christie. The trial court terminated the Department's supervision and granted supervised visitation time to Jonathan. Jonathan now appeals raising one assignment of error for our review, as quoted below.

**THE TRIAL COURT ERRED IN GRANTING LEGAL CUSTODY TO CHRISTIE COLE FOR THE CHILD BECAUSE IT WAS NOT IN HER BEST INTERESTS AND FATHER WAS FULLY CAPABLE AND WILLING TO PROVIDE AN ADEQUATE PERMANENT RESIDENCE FOR THE CHILD.**

*Law and Analysis*

{¶4} This case involves legal custody, which is defined by statute as

a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, *all subject to any residual parental rights, privileges, and responsibilities*. * * *

---

[2] Although the initial filing requested that Jonathan be named the residential parent, the motion was amended during a hearing on January 22, 2015. (*See* Tr. at 106.)
[3] The final hearing was conducted on four different days. (*See* Tr. of Proceedings Sept. 19, 2014, Jan. 22, 2015, Jan. 26, 2015, Feb. 26, 2015.)

(Emphasis added.) R.C. 2151.011(B)(21). Therefore, the trial court's order did not divest Jonathan of his "residual parental rights, privileges, and responsibilities," and he can petition the court for a modification of custody in the future. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 17.

{¶5} Legal custody can be awarded to a parent or other person requesting legal custody after a child is adjudicated "abused, neglected, or dependent," and the trial court finds by a preponderance of the evidence that legal custody is in the best interest of the child. R.C. 2151.353(A)(3); R.C. 2151.415; *see In re J.R.*, 3d Dist. Allen No. 1-14-22, 2015-Ohio-643, ¶ 18; *In re Bixler*, 3d Seneca No. 13-05-41, 13-05-42, 2006-Ohio-3533, ¶ 23; *In re B.H.*, 8th Dist. Cuyahoga No. 95794, 2011-Ohio-1967, ¶ 9. While R.C. 2151.353 does not provide factors for the trial court to consider when determining the child's best interests in a request for legal custody, the factors listed in R.C. 3109.04(F)(1) have been used to guide the courts in determining the best interest of the child in legal custody cases. *See In re M.H.*, 3d Dist. Seneca No. 13-13-45, 13-13-46, 2014-Ohio-1485, ¶ 13; *In re Bixler* at ¶ 25, fn. 1; *In re M.A.*, 12th Dist. Butler No. CA2011-02-030, 2012-Ohio-545, ¶ 16. These factors are:

> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1). The court is required to consider all other relevant circumstances in making its determination. *See* R.C. 3109.04(F)(1); *In re M.A.* at ¶ 16.

**{¶6}** The trial court's decision to award legal custody based on the best interest of the child is left to the trial court's discretion. *In re J.R.* at ¶ 17; *In re Bixler* at ¶ 24; *see Errington v. Errington*, 3d Dist. Wyandot No. 16-01-17, 2002-Ohio-1419, 2002 WL 479161, *2. This standard requires that the trial court's reasoning not be disturbed on appeal unless it was contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *Muckensturm v. Muckensturm*, 3d Dist. Hancock No. 5-11-38, 2012-Ohio-3062, ¶ 16; *Bruce v. Bruce,* 3d Dist. Marion No. 9-10-57, 2012-Ohio-45, ¶ 13.

**{¶7}** In the instant case, the trial court applied the factors of R.C. 3109.04(F)(1), as well as many other factors, in its twenty-one page judgment entry, and determined that the grant of legal custody to Christie was in K.S.'s best interest. Reviewing the parents' wishes per R.C. 3109.04(F)(1)(a), the trial court specifically pointed out that upon K.S.'s birth, Megan wanted the child to be placed in Christie's custody and she wanted legal custody to be granted to

Christie. (*See* R. at 118, at 6.) As relevant to factors (c) and (d) of the statute, the trial court noted that K.S. was bonded with Christie and other residents of Christie's home, which included Christie's son, K.S.'s brother—D.S., and Rodney Davis. (*Id.* at 7-9, 15.) The trial court noted that K.S. was particularly close with her half-brother, D.S., and that they were "best friends," looking for each other upon waking up in the morning. (*Id.* at 9.) Based upon the testimony, the trial court determined that separation from D.S. would not be in K.S.'s best interest. (*See id.* at 11, 18.) Christie's extended family was bonded with the child as well, while the evidence showed that Jonathan's father only saw the child for "roughly 20 minutes total" and his mother provided some supervision during the visitations in her home. (*Id.* at 8-9.) The trial court also noted that Christie's home was the only place where K.S. had ever lived and that Christie "has provided a loving caring and nurturing environment" for K.S., who has been "thriving in her care." (*Id.* at 9, 15, 18.) K.S. "has had limited contact with" Jonathan. (*Id.* at 15.)

{¶8} With respect to factor (e), which is mental and physical health of the involved parties, the trial court noted no known mental or physical conditions or disabilities of K.S. or Christie, but multiple issues regarding Jonathan. (*Id.* at 8, 16.) Although Jonathan denied having any mental illnesses and believed that he was only being treated for anxiety, the testimony from a therapist who provided chemical and individual mental health treatment for Jonathan disclosed that Jonathan was diagnosed with being bipolar, having intermittent explosive

disorder, unspecified antisocial disorder, and sleep disorder. (*Id.* at 7, 11, 14, 15.) Other testimony disclosed "significant unresolved anger and mental health issues," and failure to apply the skills provided at therapy to address his anger and drug/alcohol issues. (*Id.* at 6, 7, 8, 11-12.) The trial court noted that Jonathan "obsessed about [K.S.'s] weight," in spite of the evidence that K.S. had been "proportional in height and weight" since her birth. (*Id.* at 6-7, 9.) Additionally, Jonathan struggled with alcohol and drug addiction. (*Id.* at 17.) Throughout the pendency of this case, Jonathan passed twelve random drug screens but failed two, testing positive for cocaine and amphetamines. (*Id.* at 7.) He refused to complete the AA/NA program, as recommended by the Department in the case plan prepared for him. (*Id.*) The trial court concluded that Jonathan had not addressed his alcohol or drug issues and did not keep track of the number of days he had been sober. (*Id.* at 11, 14, 17.)

{¶9} Reviewing factor (f), the trial court noted that Christie "demonstrated that she would honor any court directed visitation orders," in spite of Jonathan's hostility toward her, because she believed the visitations would be in K.S.'s best interest. (*Id.* at 8, 9, 10, 16.) Conversely, Jonathan "demonstrated open disdain and contempt for Christie" and had "no meaningful relationship" with Megan, which led the court to believe that Jonathan would not honor or facilitate the court-approved parenting time with Christie or Megan. (*Id.*; *see also id.* at 7, 14.)

Under factor (i), the court noted no credible evidence that Christie had ever denied Jonathan or Megan the right to parenting time with K.S. (*Id.* at 17.)

{¶10} Among other factors relevant to the trial court's decision were reports of Jonathan's aggressive behavior and threats toward Christie, which resulted in a Christie obtaining a civil protection order against him. (*Id.* at 7, 10.) The trial court noted that Jonathan reportedly attempted to obtain a gun to shoot Christie. (*Id.* at 10-11.) He "pushed [Christie] for visits that were not approved by the Court." (*Id.* at 11.) The trial court also acknowledged that although "early in the case" Jonathan showed involvement in working with the Department, after February 2014, "the tone and productivity" of the meetings changed. (*Id.* at 6.) Jonathan became aggressive toward the Department's caseworkers, threatened to get caseworkers fired, left aggressive phone messages, and made "unreasonable demands." (*Id.* at 6, 12.) This behavior resulted in the caseworkers' meetings with Jonathan being conducted at the court, at Jonathan's parole officer's office, or in the presence of a third person. (*Id.* at 6, 11.)

{¶11} The trial court noted Jonathan's criminal history, which included several felony convictions and three incarcerations. (*Id.* at 7, 17.) In its judgment entry, the trial court described Jonathan's status as "on Parole" and noted his "criminal past and adverse contact with law enforcement" as quoted below:

a. Burglary Conviction – Felony 3rd Degree (Exhibit 8)

b. Probation Violation Complaints for testing positive for Cocaine (Exhibits 9-10)

c. Admission to the Probation Violations (Exhibit 11)

d. Probation Violation Complaint for his failure to report as ordered, for consuming alcohol and for not attended AA meetings (Exhibit 12)

e. Admission to the Probation Violation (Exhibit 13)

f. Violation of Protection Order Conviction – Felony 5th Degree (Exhibit 14)

g. Aggravated Robbery Conviction – Felony 1st degree (Exhibit 15)

h. Attempted Tampering with Evidence Conviction – Felony 4th degree (Exhibit 15)

i. Kidnapping Conviction – Felony 1st degree (Exhibit 15)

j. Probation Violation Complaint for failing to report and failure to comply with mental health and substance abuse treatment as ordered and harassment of a female by phone (Exhibit 17)

k. Admission the Probation Violation Complaint (Exhibit 18)

l. The Civil Protection Order obtained by Christopher Massie which remains in effect as of the time of this hearing (Exhibit 19)

m. The Civil Protection Order obtained by Father's own mother Susan Howell (Exhibit 20).

(*Id.* at 17-18.)   The trial court noted that Jonathan "committed a Robbery and Kidnapping in the presence of a minor" and that he threatened his ex-girlfriend's son during the commission of his violation of protection order.  (*Id.* at 18.)   The

trial court was further made aware that Jonathan was "abusive to [Megan] during their relationship." (*Id.* at 8.)

**{¶12}** The trial court acknowledged an injury that occurred to K.S. on February 22, 2015, during a visit at Jonathan's brother's house that was supervised by the brother. (*See id.* at 14.) The trial court did not find credible Jonathan's explanation of the incident, which indicated that K.S. "was climbing stairs and fell when child gate failed." (*Id.* at 14, 17.) Although K.S. hit her head, cried, and "went out," Jonathan failed to call the Department or take K.S. to a doctor, because "[h]e figured since Christie was a nurse, she would take care of [K.S.]." (*Id.*) He did not think that he had made a mistake in handling the situation and claimed that K.S. did not appear seriously hurt when she left his brother's house. (*Id.*) The trial court noted that Jonathan's mother expressed no concern about the injury, stating "accidents happen." (*Id.* at 13.)

**{¶13}** The trial court noted that the Department's workers assigned to this case did not recommend Jonathan as a residential parent or legal custodian for K.S. Caseworker Jesusa Behee ("Behee"), who handled this matter for the Department since the beginning of the case, opined that unsupervised visits with Jonathan would not be safe for K.S. (*Id.* at 7.) She believed that it would not be appropriate to place K.S. with Jonathan and she supported placing K.S. in the legal custody of Christie. (*Id.* at 8.) Crystal Brady, who continued the caseworker duty after September 2014, echoed Behee's recommendations. (*Id.* at 11-12.) Megan

Buenger, who supervised some of Jonathan's visits with K.S., noted that during the visits Jonathan was "overly concerned" with K.S.'s weight, or with K.S. getting messy and scraping her knees. (*Id.* at 8-9.) Furthermore, he was focused on discussing the case plan and criticizing Christie, instead of focusing his attention on the child. (*Id.* at 9.) Jonathan's mother failed to properly supervise Jonathan's visits with K.S., when they took place in her house. (*Id.* at 9.) Kara Schoen, who was the Court Appointed Special Advocate for K.S., believed that Jonathan loves K.S. "but goes about it the wrong way by taking out his frustration on others." (*Id.* at 11.) She recommended that legal custody of K.S. be granted to Christie and that Jonathan have supervised visitations only. (*Id.*)

{¶14} As of September 2014, Jonathan did not have a residence suitable for K.S., having moved several times during the pendency of the proceedings. (*Id.* at 7.) In the final judgment entry, the trial court noted that Jonathan was "in the process of acquiring his own apartment." (*Id.* at 14.)

{¶15} The trial court acknowledged the testimony of Reverend Pam Easterday, the pastor of the church that Jonathan had been attending for approximately one year. (*Id.* at 13.) Although the pastor had limited or no knowledge of Jonathan's criminal past or mental health issues, she believed that Jonathan could be a good father. (*Id.*) Similarly, the trial court recognized that Jonathan had completed parenting course work through Parenting Passport and "completed parenting classes through WSOS." (*Id.*) Jonathan's father was

supportive of his son, talking to him "approximately once per month," but only having had limited contact with K.S. for a total of twenty minutes. (*Id.* at 8.) Susan Howell, Jonathan's mother, testified that K.S. had "changed [Jonathan's] life." (*Id.* at 13.)

{¶16} Based on the testimony, the trial court noted that Jonathan claimed that Christie was "against" him and she was "the problem in the case." (*Id.* at 7, 14.) He admitted calling Christie names. (*Id.* at 14.) He further believed that the fact that D.S. lived with Christie was being used against him. (*Id.*) Jonathan blamed the Department for his failing relationship with his brother and sister-in-law. (*Id.*) He further suggested that the Department lied about the threats made to its caseworkers, and suggested that the Department was in "a conspiracy" with Christie and K.S.'s pediatrician "to cover up [K.S.'s] weight problem." (*Id.* at 14.) In his testimony Jonathan blamed a coordinator from the Parenting Passport program for K.S.'s injuries, alleging that the coordinator gave him "a bad child gate." (*Id.*) He believed that the records about his mental conditions from Firelands Counseling Services were "inaccurate." (*Id.* at 7.) In spite of the multiple witnesses testifying about his aggressive behavior throughout the pendency of the case, he did not believe that he had done anything wrong. (*Id.* at 14.)

{¶17} All of the findings of the trial court are well supported by the evidence. While Jonathan disputed the testimony about threats he made to the

Department and its caseworkers (*see id.* at 14), the trial court has evaluated the credibility of the testimony and we will not reverse its findings if they are supported by competent, credible evidence.

{¶18} On appeal Jonathan argues that he should have been granted custody because "he has gained a trusting relationship with his daughter," they interacted well, and K.S. had " 'a pretty good bond' " with him. (App't Br. at 9-10, quoting Tr. at 122.) Jonathan further lists the elements of the case plan that he had completed, in addition to taking parenting classes, as well as anger management and substance abuse programs. (App't Br. at 14-15.) In arguing that placement with Christie was not in K.S.'s best interest, Jonathan emphasizes his good relationship with his daughter and alleges that Rodney Davis, who lives with Christie, is "capable of being violent because he has "a domestic violence charge." (*Id.* at 10.) Jonathan minimizes concerns about his mental and physical health, stating that he had "conquered his demons" and is working on getting better for the benefit of his daughter. (*Id.* at 11-13.) He justifies his failure to attend AA/NA meetings by stating that he is receiving help from his church rather than from the meetings. (*Id.* at 11-12.) He alleges that the meetings were not beneficial for him because of a bad influence of other attendants at the meetings. (*Id.* at 11-12.) In sum, Jonathan states that his continuous improvement and willingness to address his mental and substance abuse issues, together with "a

sincere love for his daughter," prove that placing K.S. in his custody would be in the best interest of the child.

{¶19} Upon review of the evidence, we find that in making the best interest determination, the trial court considered all the issues raised by Jonathan on appeal. While we do not diminish the significance of Jonathan's hard work, we cannot ignore the reports of his aggression toward caseworkers and toward K.S.'s care provider. Throughout the pendency of the case and his testimony at the hearing, Jonathan has failed to acknowledge responsibility for his actions and his conditions, placing blame on other parties. His failure to cooperate with the Department's caseworkers, failure to maintain a stable residence, and failure to apply the skills provided at therapy to address his anger and drug or alcohol issues, contradict his assertions that he is able to provide appropriate care for K.S. at this time. *See In re Bixler*, 3d Seneca No. 13-05-41, 13-05-42, 2006-Ohio-3533, at ¶ 26 (holding that the juvenile court's decision to grant legal custody to non-parents was not an abuse of discretion where the mother "had completed the case plan, but * * * she had 'not demonstrated an application of those skills,' " "had 'not demonstrated stability with her adult relationships,' " and the child's guardian ad litem and the mother's social worker believed it was in the child's best interest to grant legal custody to non-parents).

{¶20} Although Jonathan can petition the court for a modification of custody in the future, the trial court did not abuse its discretion in finding that legal

custody of K.S. with Christie was in K.S.'s best interest *at this time*. *See In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 17; *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 36 ("This grant of mere legal custody means that Gorslene was never divested of her fundamental parental rights, and she can therefore petition the courts for a custody modification at any time."). Therefore, the assignment of error is overruled.

### *Conclusion*

**{¶21}** Having reviewed the arguments, the briefs, and the record in this case, we find no error prejudicial to Appellant in the particulars assigned and argued. The judgment of the Common Pleas Court of Seneca County, Ohio, Juvenile Division is therefore affirmed.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/hlo**