[Cite as *In re S. Children*, 2015-Ohio-4934.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | | JUDGES: |
| IN RE: S. CHILDREN | : | Hon. W. Scott Gwin, P.J. |
| | : | Hon. William B. Hoffman, J. |
| | : | Hon. John W. Wise, J. |
| | : | |
| | : | |
| | : | Case No. 2015CA00111 |
| | : | |
| | : | |
| | : | O P I N I O N |


CHARACTER OF PROCEEDING:      Civil appeal from the Stark County Court of
                             Common Pleas, Juvenile Division, Case
                             No. 2014JCV00486


JUDGMENT:                    Affirmed


DATE OF JUDGMENT ENTRY:      November 23, 2015

APPEARANCES:

For: Plaintiff-Appellee              For: Defendant-Appellant

JAMES PHILLIPS, JR.                  DAVID SMITH
SCJFS                                245 33rd St. N.W.
221 Third St. S.E.                   Canton, OH  44709
Canton, OH  44702

*Gwin, P.J.*

**{¶1}** Mother–Appellant, Samantha D. appeals the May 7, 2015 judgment entry of the Stark County Court of Common Pleas, Juvenile Division. Appellee is Stark County Job and Family Services ["SCJFS"].

*Facts and Procedural History*

**{¶2}** On May 21, 2014, SCJFS filed a complaint alleging abuse, neglect and dependency of T. S. (b. November 3, 2004) and S.S. (b. December 17, 2007), and requesting an order to place the children in the temporary custody of their Paternal Grandparents subject to the Protective Supervision of the SCJFS.[1]

**{¶3}** At the emergency shelter care hearing, the court ordered that the children be placed into the temporary custody of the Paternal Grandparents subject to the Protective Supervision of the SCJFS.

**{¶4}** On August 14, 2014, the trial court found both children to be abused children and continued them both in the temporary custody of their Paternal Grandparents subject to the Protective Supervision of the SCJFS. The trial court further approved and adopted the case plan. The case plan contained several services for the mother to successfully complete for reunification to occur. Regular six-month review hearings were held in this case with the court finding the SCJFS had made reasonable efforts to make it possible for the children to return home.

**{¶5}** On November 26, 2014, the SCJFS filed a Motion to Change Legal Custody of both children to the Paternal Grandparents. The trial court took a full day of evidence on the motion to change custody on April 27, 2015.

<u>Hearing on motion to change legal custody.</u>

---

[1] Counsel should adhere to Sup.R.Rule 44(H) and 45(D) concerning disclosure of personal identifiers. See also Juv R. 5.

{¶6}    The allegations in the complaint were centered on physical and mental abuse of the children, domestic violence between Mother and her current paramour, medical and education neglect of S.S. and mental health concerns with Mother.

{¶7}    That case plan required Mother to complete an evaluation at Northeast Ohio Behavioral Health and follow all recommendations from it.  Mother did complete the evaluation and the recommendations were added to the case plan. Those recommendations required Mother to successfully complete Goodwill Parenting Classes, anger management classes at Freespace, engage in counseling and medication for her own mental health issues, and successfully complete the Intensive Child Parent Interaction Program. The evaluation did not recommend reunification of the children with Mother unless the children could tolerate contact with her paramour.

{¶8}    The ongoing caseworker, Vicki Mitchell testified that Mother received a Certificate of Attendance from the Goodwill Parenting Program which is the lowest one available if a person actually shows up for the program.  The worker attended every visitation between the Mother and the children. The caseworker testified Mother would either expose the children to things that would remind them of her paramour, who was their main abuser, or bring up subjects that would trigger the children's behaviors. She continued to engage in this behavior despite being instructed not to on several occasions. The children's behaviors would then become violent with each other and others.

{¶9}    Mother was sent for additional counseling at Northeast Ohio Behavioral Health in an effort to get her to understand and acknowledge the trauma and abuse her actions and the actions of her paramour had inflicted upon her children. One group counseling session with

Mother and the children was attempted but went so bad that the professionals refused to attempt a second one due to the risk it posed to the mental wellbeing of the children.

{¶10} Mother refused to attend group counseling at Freespace because her paramour might need her car. Mother did attend some individual sessions but demonstrated no insight and continued to defend her paramour's actions against the children and herself. Ms. Mitchell testified that Mother had not successfully completed her case plan or reduced any risk to the children. She further testified that Mother displayed no insight into the harm she caused her children and continued to defend her actions.

{¶11} The caseworker further testified that she had witnessed the interaction between the children and the paternal grandparents on several occasions. The children are bonded to the paternal grandparents. Both children have made extreme progress since being placed into the paternal grandparent's home. Ms. Mitchell stated that the children are completely different children when she sees them in the paternal grandparent's home then when they were visiting with Mother. They are calm and loving when in the paternal grandparent's home. The children have both expressed their strong desire to remain in their paternal grandparent's home. Ms. Mitchell testified that she believed that granting legal custody of the children to the paternal grandparents was in the children's best interest.

{¶12} The guardian-ad-litem also reported great growth of the children since their placement with the paternal grandparents and recommended the change of legal custody be granted.

{¶13} Carrie Schnirring testified at the trial. Ms. Schnirring completed the mental health evaluation on both children. Ms. Schnirring testified that both children described being made to stand in the corner for hours or sometimes until the next day. They described being beat with a belt

and having to eat only what they could hold in their hand while standing up. Ms. Schnirring testified that Mother's excuse that she did not know any better did not make any sense. Ms. Schnirring testified that she went over the concerns of the evaluation and the fear of the children of her paramour with Mother. Mother refused to acknowledge the concerns and actually stated she believed the children loved her paramour. Ms. Schnirring testified she had no concerns with the paternal grandparents based on her interaction with them.

{¶14} The trial court also heard testimony from Dr. Aimee Thomas. Dr. Thomas completed the parenting assessments on Mother and her paramour, Jason Artrip. Mother reported issues with low self-esteem, mood dysregulation, high anxiety, and persistent fears. Mother reported not being able to do basic life activities without the assistance of her paramour. Dr. Thomas diagnosed Mother with generalized anxiety disorder and dependent personality disorder. Dr. Thomas stated that the way Mother attempted to raise her children was very punitive and not nurturing in any way. Dr. Thomas testified that Mother did not internalize how problematic her actions were to her children and how her actions affected her relationship with her children. Dr. Thomas testified that Mr. Artrip found nothing wrong with his conduct in abusing the children. Dr. Thomas testified that Mother was one of the most mentally ill people she has conducted an exam on that has not been diagnosed with Bi-Polar or Schizophrenia. Dr. Thomas testified that she did not believe that Mother would separate from Mr. Artrip or successfully make the life changes necessary to parent her children.

{¶15} Becky Crookston testified that she attempted to counsel Mother to prepare her for the Intensive Parent Child Interaction Program. Ms. Crookston testified that she had six or seven sessions with Mother including one joint session with her and the children. Ms. Crookston testified that her main goal was to get Mother to understand and have empathy for what her children had

gone through due to the abuse.   That attempt was unsuccessful because Mother never really accepted the role she played in the abuse. Ms. Crookston testified that she went over ground rules with Mother before the joint session; however, Mother violated the rules. The session was very unproductive.  Ms. Crookston testified that she chose to end her involvement with Mother after that joint session due to her belief that she could not meet the emotional needs of the children and the Intensive Parent Child Interaction Program not being appropriate for her.

{¶16}    Gail Mager was the treating counselor for both children. Ms. Mager testifies that she had been counseling both children since August of 2014.  Ms. Mager testified that she was working with both children to process the experiences they suffered while with Mother. Ms. Mager testified that when she started working with the children they were angry, had a hard time sitting still, and a hard time respecting boundaries.  Ms. Mager testified that since the children had been placed with the paternal grandparents, their behaviors and functioning have improved. The children have calmed down and are much happier where they are now.  Ms. Mager testified that she had contact with Mother on two occasions. Mother brought her paramour to the first meeting and asked if he could come back to the session.  Ms. Mager confirmed that the joint session with Mother and the children did not go well due to Mother's actions.  Ms. Mager testified that she did not believe the Mother retained for ten minutes the instructions they had given her on how to interact with her children.  Ms. Mager testified that the children have expressed a desire to remain with the paternal grandparents and that Mother could not meet their emotional needs for one hour.

{¶17}  Dr. Steve Dean completed an evaluation of Jason Artrip. Dr. Dean testified that Mr. Artrip denied perpetrating any physical abuse on the children or a prior partner. Dr. Dean found those denials not credible. Dr. Dean testified that he recommended that Mr. Artrip successfully complete a domestic violence treatment program. Dr. Dean

testified that while Mr. Artrip has been attending the program, he has made little progress and the risk he poses to children has not been reduced.

{¶18} Jennifer Fire was the Mother's instructor at the Goodwill Parenting Program. Ms. Fire testified about the extensive involvement she had with Mother during her time in the class. Ms. Fire testified that while Mother did well on her final test, she failed to apply what she learned at visits. Mother scored very low on her program goals. Ms. Fire testified that they tried to assist Mother in how to deal with her children but she failed to follow the recommendations. Ms. Fire testified extensively about the safe house exercise they did with the children and Mother. Both children actively confronted Mother about how they were abused, their fear of Mr. Artrip, and how Mother did not protect them. Mother failed to internalize any of the children's concerns and continued to defend her and Mr. Artrip's abusive actions. Ms. Fire testified that Mother did not successfully complete the program. Ms. Fire stated that she did not recommend Mother to reunify with her children.

{¶19} Mother testified at the trial. Mother testified that she only used her hand to spank the children but then admitted to using a spoon and a belt. Mother testified that she still did not believe the children were afraid of Mr. Artrip. Mother admitted to not staying current on her mental health medications and stopping them on her own. Mother admitted to not following the directions given to her for the joint session with the children and the children having to be taken out of the room at one point due to her actions. Mother defended Mr. Artrip during her testimony and clearly indicated she wanted another chance for her and Mr. Artrip.

{¶20} By Judgment Entry filed May 7, 2015, the trial court granted legal custody of the children to their paternal grandparents.

*Assignment of Error*

**{¶21}** Mother raises one assignment of error,

**{¶22}** "I. THE COURT'S ORDER STATING THAT THE CHILDREN COULD NOT BE PLACED WITH ANY BIOLOGICAL PARENT AT THE TIME OF TRIAL OR WITHIN A REASONABLE TIME WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

*Analysis*

**{¶23}** Before awarding legal custody to a non-parent, a trial court must ordinarily make a finding that each parent is unsuitable. *In re L.M.*, 2nd Dist. Greene No.2010–CA–76, 2011–Ohio–3285, ¶ 18 *citing In re Hockstock*, 98 Ohio St.3d 238, 2002–Ohio–7208, 781 N.E.2d 971. This requirement does not apply, however, in cases involving abuse, neglect, or dependency. Id. The Ohio Supreme Court in *In re C.R.* held "[a] juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of the unsuitability of the child's custodial and/or noncustodial parents." 108 Ohio St.3d 369, 2006–Ohio–1191, 843 N.E.2d 1188, paragraph one of syllabus. Thus, "[w]hen a juvenile court adjudicates a child to be abused, neglected, or dependent, it has no duty to make a separate finding at the dispositional hearing that a noncustodial parent is unsuitable before awarding legal custody to a nonparent." *In re L.M.*, 2011–Ohio–3285 quoting In re C.R., 108 Ohio St.3d 369, paragraph two of syllabus.

**{¶24}** Importantly, the award of legal custody is "not as drastic a remedy as permanent custody." *In re L.D.,* 10th Dist. No. 12AP–985, 2013–Ohio–3214, ¶ 7. *See also In re N.F.,* 10th Dist. No. 08AP–1038, 2009–Ohio–2986, ¶ 9. This is because the award of legal custody does not divest parents of their residual parental rights, privileges, and responsibilities. *In re C.R.* at ¶ 17.

Therefore, since the granting of legal custody does not divest a parent of his or her fundamental parental rights, the parent can petition the court for a custody modification in the future. *In re L.D.* at ¶ 7.

{¶25} "A trial court has broad discretion in proceedings involving the care and custody of children." *In re Mullen,* 129 Ohio St.3d 417, 2011–Ohio–3361, ¶ 14. We review the award of legal custody for an abuse of discretion. *In re L.D.* at ¶ 8; *In re Gales,* 10th Dist. No. 03AP–445, 2003–Ohio–6309, ¶ 13; *In re N.F.,* 10th Dist. No. 08AP–1038, 2009–Ohio–2986, ¶ 9, citing *In re Nice,* 141 Ohio App.3d 445, 455 (7th Dist.). Abuse of discretion connotes more than an error of law or judgment; rather, it implies that the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983).

{¶26} Unlike in a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard of review in legal custody proceedings is a preponderance of the evidence. *In re S.D.*, 5th Dist. Stark Nos. 2013CA0081, 2013CA0082, 2013-Ohio-5752, ¶ 32; In *re A.C.,* 12th Dist. No. CA2006–12–105, 2007–Ohio–3350 at ¶ 14; *In re Nice,* 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist.2001).

{¶27} In this type of dispositional hearing, the focus is on the best interest of the child. *In re C.R.,* 108 Ohio St.3d 369, 2006–Ohio–1191, 843 N.E.2d 1188; *In re P.S.,* 5th Dist. No.2012CA00007, 2012–Ohio–3431. Despite the differences between a disposition of permanent custody and legal custody, some Ohio courts have recognized "the statutory best interest test designed for the permanent custody situation may provide some 'guidance' for trial courts making legal custody decisions." *In re A.F.,* 9th Dist. No. 24317, 2009–Ohio–333 at ¶ 7, citing *In re T.A.,* 9th Dist. No. 22954, 2006–Ohio–4468 at ¶ 17; *In re S.D.* 5th Dist. Stark Nos. 2013CA0081, 2013CA0082, 2013-Ohio-5752, ¶ 33 .

{¶28}  R.C. 2151.414(D) sets forth factors to be considered in making a determination regarding the best interest of the child. These factors include, but are not limited to, the following:

(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers, and any other person who may significantly affect the child;

(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

(4) The child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶29}  In the case at bar, the trial court found,

Mother's Motion for Extension of Temporary Custody is denied. The Court does not believe that another six months would enable the children to be reunited with her. As of trial, it has been eleven months since the children were identified at emergent risk and removed from Mother's home, but she has made little progress. She still does not take ownership of her abusive approach to parenting; in fact she continues to view it as mere discipline and does not understand that it was wrong. Eleven months later she still clings to her relationship with Jason Artrip despite the abuse he perpetrated on her

children. Eleven months later she still fails recognize the impact of the trauma on the children and accuses them of exaggerating or of being coached. Mother failed to provide any professional testimony or evidence that she is successfully addressing any of the concerns that gave rise to the removal of the children from her care.

* * *

Dr. Thomas diagnosed Mother as having generalized anxiety disorder, social anxiety disorder, panic disorder with agoraphobia and dependent personality disorder. Dr. Thomas diagnosed Mr. Artrip as having a cannabis abuse disorder and other specified personality disorder— anger management problems, stubborn, irresponsible. The children report Mr. Artrip using marijuana. Mother denies this. Mr. Artrip's first and only urine drop was negative, but he did not drop in a timely manner, and he has refused subsequent drug tests. No evidence was presented as to any evaluation for Father, other than the concerns with domestic violence and anger management. [T.S.] was diagnosed as having adjustment disorder with anxiety. He also demonstrates some of the criteria for post-traumatic stress disorder, but has not been so diagnosed. Carrie Schnirring of NEOBH conducted the evaluation of [T.S.] and [S.S.]. Ms. Schnirring was struck by the emotion that [T.S.] exhibited when describing the beating that Mr. Artrip gave [S.S.]. He appeared to be reliving it as he told it. Ms. Schnirring first saw the children on June 24, 2014, about one month after being removed from Mother's home. Ms. Schnirring described [S.S.] as still being on "high alert." [S.S.] has been

diagnosed with adjustment disorder with mixed disturbance of conduct and emotion. It is also possible that she suffers from ADHD, although the symptoms of ADHD closely mirror the symptoms associated with PTSD; and, given her history, it is likely that at least some of those symptoms were caused by what happened to her in her mother's home. There is currently no concern about physical health of any of the parties, although when the children were with Mother and Mr. Artrip, they suffered abuse, including mental abuse and physical abuse that left temporary marks.

{¶30} As set forth in our statement of the facts and procedural history, these findings are based upon competent, credible evidence presented to the trial court during the evidentiary hearing.

{¶31} The testimony also revealed that the children are thriving in their placement.  They are loved and bonded with the grandparents.

{¶32}  Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented that a change in legal custody was in the best interest of the children.

{¶33} For the foregoing reasons, the judgment of the Stark County Court of Common Pleas, Juvenile Division, is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Wise, J., concur