[Cite as *In re M.B.*, 2023-Ohio-1804.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: M.B.

C.A. No.     30383

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 21-05-000409

DECISION AND JOURNAL ENTRY

Dated: May 31, 2023

SUTTON, Presiding Judge.

{¶1}    Appellant, J.B. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her minor child in the legal custody of the child's father, J.W. ("Father").  This Court affirms.

I.

{¶2}    Mother and Father are the biological parents of M.B., born April 4, 2019.  Mother's three older children, who are not Father's children, have also been removed from Mother's custody but they are not parties to this appeal.

{¶3}    Mother and Father met through a bowling league and had a romantic relationship together.  At the time, Mother and Father were each involved in a long-term romantic relationship with another partner; lived with their respective partners; and did not disclose to them that they had an affair or that Father was M.B.'s biological father.  Father was married, while Mother was involved in a long-term relationship with D.A., who is also the father of two of her older children.

{¶4} A prior criminal case is relevant to this legal custody appeal. The criminal case involved D.A., Mother, and Mother's oldest child, S.C., who is not D.A.'s child. Shortly after M.B. was born in 2019, while Mother was still hospitalized and D.A. was caring for her other children, then 14-year-old S.C. alleged that D.A. sexually molested her while she was showering. After S.C. disclosed the molestation, she alleged that Mother tried to persuade her to retract her allegations. D.A. was ultimately convicted of sexual imposition, Mother was convicted of child endangering and obstructing justice, and this Court affirmed those convictions on appeal. The appellate decision from the criminal case was admitted as an exhibit at the legal custody hearing in this case.

{¶5} After the criminal incidents, S.C. was removed from Mother's custody, placed in the legal custody of her father, and a court order was issued that prohibited D.A. from having any contact with S.C. It is unclear whether Mother's contact with S.C. was affected by the no contact order because the specific details of that order, and S.C.'s change in custody, are not set forth in the record in this case.

{¶6} During March 2021, Father filed an action in domestic relations court for the allocation of parental rights and responsibilities regarding M.B. According to Father, when Mother learned that Father was seeking shared parenting, she threatened to move with M.B. to Tennessee. When the domestic relations case was heard by a magistrate, Mother appeared via teleconference and reported that she had moved to Tennessee with M.B., so the domestic relations court granted Father visitation time with M.B. in Tennessee. The parties have disputed whether Mother was, in fact, living in Tennessee at that time. Two months later, however, they agree that Mother was residing with her three youngest children in Summit County.

**{¶7}** On May 27, 2021, Summit County Children Services Board ("CSB") filed a complaint to commence this case. The complaint alleged that M.B. was an abused and neglected child because of substance abuse in the home and because Mother continued a romantic relationship with D.A., and was placing her children at risk by allowing D.A. to have contact with them. The complaint further alleged that then 16-year-old S.C. had run away from her father's home to Mother's home, that Mother had allowed D.A. to have contact with her, and that D.A. had given S.C. illegal drugs and sexually molested her again. All four children were removed from Mother's home, but the facts pertaining to the other children are not detailed in the record. The only child who is a party to this appeal, M.B., was placed in the emergency temporary custody of Father.

**{¶8}** CSB later dismissed the allegations of abuse pertaining to M.B. Mother waived her right to a contested adjudicatory hearing and agreed to an adjudication of dependency. M.B. was adjudicated dependent under R.C. 2151.04(C), based on the allegations in the complaint that the child lived in a home in which she was exposed to ongoing drug use and the risk posed by the man who had sexually abused her sibling.

**{¶9}** The parents also waived their rights to a dispositional hearing and agreed that the trial court would place M.B. in the temporary custody of Father under an order of protective supervision by CSB. The trial court adopted the case plan, which required Mother to obtain a substance abuse assessment and comply with all treatment recommendations; submit to drug testing as requested by CSB; sign all necessary releases of information; and participate in counseling and case management services through an agency named Ever Well, to help her understand how her relationship with a sex offender affected her family. The case plan required Father to facilitate regular visitation between Mother and M.B.

{¶10} During the next several months, Father facilitated visits between Mother and M.B. Mother, however, did little to comply with the requirements of the case plan. She obtained a substance abuse assessment, but did not follow through with the recommendation that she engage in substance abuse counseling. Mother did not participate in any sexual offender education. CSB and the guardian ad litem believed that Mother was maintaining a relationship with D.A. and did not recognize the risk that he posed to her young daughter. Moreover, Mother continued to express disbelief that D.A. had sexually abused S.C. in 2019, even though Mother and D.A. had been convicted for their roles pertaining to that incident and their convictions had been affirmed on appeal. Mother also expressed doubt about S.C.'s allegations in 2021 that D.A. had again sexually abused her after Mother permitted him to have contact with her. CSB and the guardian ad litem were reasonably concerned that Mother chose to believe D.A. instead of her own daughter.

{¶11} Shortly after the adjudication and initial disposition of M.B., Father moved for legal custody of her. Mother moved for legal custody several months later. A hearing on their competing dispositional motions was held before a magistrate. The magistrate concluded that legal custody to Father was in the best interest of M.B. and granted Father's motion. Mother filed objections to the magistrate's decision, which were overruled by the trial court. The trial court placed M.B. in the legal custody of Father and granted Mother supervised visitation as agreed by the parties. Mother appeals and raises three assignments of error.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED WHEN IT GRANTED LEGAL CUSTODY OF THE MINOR CHILD TO FATHER AND DENIED MOTHER'S MOTION FOR LEGAL CUSTODY AS [CSB] FAILED TO MEET ITS BURDEN OF PROOF AND THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶12} Mother's first assignment of error is that the trial court's decision to place M.B. in the legal custody of Father was against the manifest weight of the evidence. An award of legal custody must be supported by a preponderance of the evidence. *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7. "Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value." (Internal quotations omitted.) *Id.*

{¶13} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶14} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. No specific test or set of criteria is set forth by statute regarding an award of legal custody, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23.

{¶15} Most of Mother's argument asserts that she had complied with the requirements of the case plan, so M.B. should have been returned to her custody. "Although case plan compliance is not dispositive of the issue of best interest of the child, it is nevertheless relevant." *In re Z.T.*,

9th Dist. Summit No. 29746, 2021-Ohio-2023, ¶ 21. The evidence in this case, however, demonstrates that Mother made minimal effort to comply with the requirements of the case plan and refused to maintain contact with the caseworker. Mother obtained a substance abuse assessment and engaged in medication management to help her wean off her long-term addiction to opioids, but she did not engage in the recommended counseling. Mother stated that she had been taking buprenorphine to wean herself off opioids for nearly three years. Although she supplied the guardian ad litem with a letter and some other information from her doctor, she refused to sign information releases. The guardian ad litem testified that there were many questions that he would have liked to ask Mother's doctor about her medically assisted drug treatment but could not because of the lack of a release.

{¶16} Moreover, one of the most significant problems in Mother's home was that her children had been exposed to the ongoing threat of sexual abuse by D.A. Mother did not engage in counseling to understand how her past and ongoing relationship with D.A. posed a serious risk to her young daughters. Moreover, Mother had accepted no responsibility for the past abuse of her daughter, nor had she gained any insight into how to protect her daughters from an abuser. Several witnesses testified that they had seen Mother with D.A. or had other evidence to convince them that Mother continued a relationship with D.A., despite Mother's insistence that they were no longer together. Mother chose to believe D.A.'s denials that he sexually abused S.C. instead of her own daughter and the criminal justice system. Mother's lack of case plan progress did not weigh in her favor in the trial court's determination about the best interest of the children.

{¶17} As a party seeking legal custody of M.B., Mother had the burden of proving by a preponderance of the evidence that placement of M.B. in her legal custody was in the child's best interest. *In re A.W.*, 9th Dist. Lorain No. 20CA011671, 2021-Ohio-2975, ¶ 17, citing *In re T.R.*,

9th Dist. Summit Nos. 25179 and 25213, 2010-Ohio-2431, ¶ 27. The only evidence Mother offered to support her motion was her own testimony, but even she admitted that she had "[n]ot yet" started any drug counseling. As will be explained below, Mother's testimony that she had achieved some stability in her life and ended her relationship with D.A. was contradicted by other evidence.

{¶18} Mother's trial counsel spent much of the legal custody hearing attempting to dispute the factual allegations that formed the basis of M.B.'s dependency adjudication. To begin with, Mother waived her right to a contested adjudicatory hearing and agreed that M.B. was a dependent child based on the facts alleged in the complaint. Moreover, the time to challenge the dependency adjudication and initial disposition of the child was at that time, as the judgment was final and appealable at that time. *See In re Murray*, 52 Ohio St.3d 155 (1990), syllabus. The time for that appeal had lapsed long before this appeal was filed and this Court lacks jurisdiction to review the basis for the adjudication in this appeal. *See In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, syllabus.

{¶19} "[T]he primary focus at the legal custody hearing was on the current parenting ability of each potential custodian and whether it was in the best interest of the child[ ] to be permanently placed in the legal custody of [either] of them." *In re K.C.*, 9th Dist. Summit Nos. 26992 and 26993, 2014-Ohio-372, ¶ 20. The juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the

custodial history of the child, and the child's need for permanence. R.C. 2151.414(D)(1)(a)-(e)[1]; *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16.

{¶20} The juvenile court may also consider the best interest factors in R.C. 3109.04(F)(1). *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While many factors overlap with those set forth in R.C. 2151.414(D)(1), a separate factor relevant here is the proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(f).

{¶21} During this case, Mother's interaction with M.B. was limited to weekly, supervised visits because she did not work on the case plan to address the risk that her substance abuse and ongoing relationship with D.A. posed to the child. Several witnesses in this case believed that Mother's interaction with M.B. should continue to be supervised until she could demonstrate more stability in her life and that she knew how to care for and protect the child. Moreover, several witnesses testified that they believed Mother might take M.B. and leave this area because she was continually saying that she was going to leave Ohio and go to Tennessee, had done so before, and had hidden M.B. in another state when this case began.

{¶22} A fundamental difference between the caregiving abilities of Mother and Father involves the stability, or lack of stability, in their homes. Mother had lived in numerous different places during this case and was again facing eviction at the time of the hearing. She lacked stable housing and income, had refused to engage in drug treatment to resolve her long-term drug abuse problem, and continued a relationship with a man who had repeatedly committed acts of sexual abuse against one of her daughters. Mother had yet to accept responsibility for putting her family

---

[1] R.C. 2151.414(D)(1)(e) also requires the trial court to consider whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply to this case, but none of those factors are relevant here.

in a situation that required CSB to remove her children from her custody. At the hearing, Mother testified that she still believes that S.C. lied about D.A. molesting her and insisted that she never asked S.C. to retract her allegations.

{¶23} M.B.'s interaction with Father had been ongoing and consistent throughout this case because she had been living in his home. Although M.B. was born after an extramarital affair between Father and Mother, Father and his wife had been in marital counseling to address his lack of fidelity and other problems in their marriage. At the time of the hearing, they had been married for 22 years and Father's wife was prepared to help Father provide M.B. with a permanent home. Father had been employed with the same company for 18 years and he and his wife had lived in the same home for 18 years. They lived in their home with their 21-year-old son, who is a student at a nearby college. Before CSB approved Father's home for placement of M.B., the agency had investigated Father, his wife, and his adult son, and had no concerns about any of them. None of them had any criminal history, mental or physical health problems, and there was no reason to believe that any of them abused drugs or alcohol. The evidence about Father and his home was entirely positive.

{¶24} Because M.B. was less than three years old at the time of the hearing, the guardian ad litem spoke on her behalf. The guardian ad litem believed that an award of legal custody to Father was in the child's best interest. He emphasized that Father led a much more stable life than Mother; no one in his home posed a threat to the child; and, in fact, M.B. was doing very well in Father's home. Father and his family were meeting all M.B.'s needs and M.B. had become bonded to the family. The guardian ad litem expressed disappointment that Mother had done nothing to work toward reunification with M.B. and was about to be evicted from another home. He also

believed that Mother continued her relationship with D.A., who posed a danger to M.B., and Mother was unable to protect the child from that danger.

{¶25} Mother emphasizes that the custodial history of M.B. included most of her short life living in Mother's custody. During that time, however, the child was exposed to Mother's substance abuse and lived in a home with a sexual offender who had perpetrated crimes against another minor daughter-figure. Mother asserts that "return[ing] to her mother's home would not be detrimental to [M.B.,]" but the trial court justifiably disagreed, given the evidence presented about the ongoing threats in Mother's life. Moreover, the question is not simply whether Mother's home is free from dangers but whether living in Mother's home is in the child's best interest.

{¶26} Since this case began, M.B. had been living in the home of Father. The evidence was undisputed that M.B. was thriving in Father's home, had acclimated to living there, and was bonded with the entire family. Mother testified that she believed that Father and his wife were providing appropriate care for MB. M.B. needed a legally secure permanent placement and Father was willing and able to provide her with a permanent home.

{¶27} Finally, the trial court considered which parent would be more likely to honor and facilitate companionship time with M.B. R.C. 3109.04(F)(1)(f). The caseworker testified that Father had cooperated with Mother in scheduling and facilitating weekly visits during this case. Father testified that he would continue to facilitate visits between Mother and M.B. and that he had found a private visitation facility in Akron that would supervise visits and was willing to split the costs of the visits with Mother.

{¶28} On the other hand, before this case began, Mother evaded Father's attempts to establish a legal relationship with M.B. and went to Tennessee. Father visited M.B. once in Tennessee at a park, but never saw the home where Mother allegedly lived. Father believed that

Mother was merely pretending to live in Tennessee because she hoped that he would be unwilling to make the 9-hour drive each way to see his child. After Father was granted temporary custody of M.B. in this case, and Mother had returned to Summit County, CSB was unable to locate her or the child. The police located Mother and M.B. at a hotel in Kentucky, and Father had to drive there to gain physical custody of the child.

{¶29} Numerous witnesses testified that, based on Mother's past conduct and her ongoing statements that she planned to move to Tennessee, they believed that Mother was a flight risk and might again attempt to keep M.B. from Father if she were granted custody. The trial court reasonably concluded that Father would be the one more likely to honor and facilitate visitation between M.B. and the other parent.

{¶30} There was substantial evidence before the trial court to support its legal custody decision. Mother has failed to demonstrate that the trial court lost its way in concluding that legal custody to Father was in the best interest of M.B. *See Eastley* at ¶ 20. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED LEGAL CUSTODY TO FATHER WHEN THE AGENCY DID NOT PROVIDE REASONABLE REUNIFICATION EFFORTS.

{¶31} Mother's second assignment of error is that CSB failed to make reasonable efforts to reunite her with M.B. The record reveals that CSB timely filed a case plan that set forth several goals for Mother, with referrals to some specific services providers. Mother does not argue that she was unable to connect with any of the required services, nor does she articulate any reunification efforts that CSB should have provided but did not. In fact, the evidence was not disputed that Mother refused to engage in many of the required reunification services and would

not sign information releases so that CSB could monitor her progress in the services that she did seek. Mother explained that she did not comply with the case plan by signing information releases or engaging in certain services because she did not believe they were necessary.

{¶32} After the trial court adopted the case plan, all parties were bound by its terms. *See* R.C. 2151.412(F)(1). CSB had an obligation to provide Mother with the enumerated case plan services, but Mother had a "corresponding obligation" to "make an effort" to participate in those services. *In re D.B.*, 9th Dist. Lorain No. 05CA008794, 2006-Ohio-522, ¶ 17. She cannot now fault the agency for her deliberate refusal to participate in services that were offered. *See id*. Mother's failure to make progress toward reunification with M.B. was caused by her own refusal to work on the goals of the case plan, not because of a lack of reunification efforts by CSB.

{¶33} Moreover, although Mother implicitly asserts that the agency's reunification efforts should have emphasized her parental rights over those of Father, she has failed to cite any authority to support such an argument. *See In re E.C.*, 9th Dist. Summit Nos. 30096 and 30097, 2022-Ohio-1223, ¶ 25. "[T]he overriding purpose of the case plan is to allow the agency to assist the parents in remedying the conditions underlying a child's removal so that the child can be returned safely to *one or both* parents' custody." (Emphasis added.) *In re K.J.*, 9th Dist. Summit No. 29915, 2021-Ohio-4413, ¶ 18. Both Mother and Father have a fundamental right to raise their child and Mother has failed to demonstrate that she holds a superior right to Father to be reunified with the child. Mother's second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DID NOT ORDER A SPECIFIC VISITATION SCHEDULE.

{¶34} Mother's third assignment of error challenges the aspect of the judgment that granted her visitation with M.B. This Court reviews a juvenile court order awarding parental

visitation for an abuse of discretion. *In re L.S.*, 9th Dist. Lorain No. 21CA011770, 2022-Ohio-3281, ¶ 28. "A trial court does not abuse its discretion unless its judgment is unreasonable, arbitrary, or unconscionable." *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). The visitation order in this case provides: "Mother shall have supervised visitation with [M.B.] as agreed and arranged by the parties." Mother challenges this order insofar as it orders that her visits be supervised and that the schedule be determined by the parties.

{¶35} The requirement that Mother's visits with M.B. be supervised, as they had been throughout this case, was recommended by CSB and the guardian ad litem because Mother had failed to comply with the reunification requirements of the case plan. Specifically, they remained concerned that Mother had yet to engage in any drug counseling and had failed to gain insight into how her relationship with D.A. posed a past and present danger to her children. Although Mother had recently stated that her relationship with D.A. was over, both the caseworker and the guardian ad litem, as well as other witnesses, testified that they believed that Mother and D.A. still lived together or at least saw each other regularly.

{¶36} Pursuant to R.C. 2151.359(A)(1)(a), the trial court retained the authority to "[c]ontrol any [parental] conduct or relationship that will be detrimental or harmful to the child[,]" which includes the authority to limit or even prohibit parental visitation with a child placed in the legal custody of another adult. *See In re M.B.*, 9th Dist. Lorain Nos. 11CA010060 and 11CA010062, 2012-Ohio-5428, ¶ 34. In determining the appropriate visitation for a parent who has lost legal custody of the child, the trial court must consider the totality of circumstances affecting the best interest of the child. *In re K.D.*, 9th Dist. Summit No. 28459, 2017-Ohio-4161, ¶ 27.

{¶37} Although Mother points to evidence that her visits with M.B. went well, they always occurred in a supervised setting. Mother had agreed to an adjudication that M.B. was a dependent child because of the dangers posed by her drug use and the presence of D.A. in her child's life, yet the evidence was clear that Mother had done little to address those problems. Because Mother had not resolved any of the parenting problems that had led to the removal of M.B. from her custody, the trial court did not act unreasonably or arbitrarily in determining that her visits with M.B. should continue to be supervised.

{¶38} As to the aspect of the order that provides that the visitation schedule be as agreed by the parties, Mother argues only that it is "unworkable[]" because she and Father "do not have a good relationship" and there is "no reason to believe that their hostility [is] likely to abate." Mother merely speculates that she and Father may not be able to agree on a schedule in the future.

{¶39} As explained above, the evidence was not disputed that Father had facilitated Mother's visitation with M.B. throughout this case and had worked with her to come up with an agreeable schedule. Rather than the trial court journalizing a set time for visitation, which might need to be changed in the future, a schedule that allows the parties to change visitation times provides them with ongoing flexibility to meet the changing needs and schedules of the parents and the child. *See In re L.S.*, 2022-Ohio-3281, at ¶ 33. Mother has failed to demonstrate that this schedule is "unworkable" or that the trial court abused its discretion by providing the parties with this flexible schedule. Mother's third assignment of error is overruled.

III.

{¶40} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

---

BETTY SUTTON
FOR THE COURT

CARR, J.
FLAGG LANZINGER, J.
CONCUR.

APPEARANCES:

JASON D. WALLACE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

THOMAS JOSEPH LOCASCIO, Attorey at Law, for Appellee.

JAMISON J. JOHNSON, Guardian ad Litem.