[Cite as *In re K.F.*, 2023-Ohio-4831.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: K.F.
     D.F.

C.A. Nos.    30700
                  30701
                  30704

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 20 12 0836
                 DN 20 12 0837

DECISION AND JOURNAL ENTRY

Dated: December 29, 2023

SUTTON, Presiding Judge.

{¶1} Appellants, C.F. ("Mother") and Y.C. ("Father C."), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed two minor children in the legal custody of one of the child's biological fathers ("Father M."). This Court affirms.

I.

{¶2} Mother is the biological mother of K.F., born June 29, 2012; and D.F., born November 22, 2009. Father M. is the biological father of K.F. and Father C. is the biological father of D.F.

{¶3} K.F. and D.F. were removed from the custody of Mother on December 14, 2020, pursuant to Juv.R. 6 because of Mother's mental health and other concerns about instability in the home. CSB filed complaints the next day to allege that both children were dependent. The juvenile court adjudicated the children dependent, by agreement of the parties. Both children were later

placed in the home of Father M. and his fiancée, M.P., where they remained throughout most of this case.

{¶4} By March 2021, Mother was having visits with the children in her home, which were supervised by the maternal great-grandfather. One month later, Father M. transported the children to Mother's home for a scheduled visit, but he did not believe that the great-grandfather was there to supervise. While he looked for the great-grandfather, Mother put the children in her car and drove off with them. Father M. called Akron Police, who pursued Mother's vehicle, eventually conducted a traffic stop, cited Mother for failing to comply with their signal to pull over, and Father M. retrieved the children.[1]

{¶5} After that incident, Mother substantially complied with visitation orders and requirements of the case plan for nearly a year. Mother's visitation with the children gradually expanded and, by March 2022, Mother began having unsupervised visits in her home. During her first unsupervised, overnight visit on April 9, 2022, however, Mother did not timely return the children to Father M.'s home the next day. Because Mother did not answer Father M.'s telephone calls, he called the police. The police later pulled over Mother's vehicle, with the children inside, and cited her for driving with a suspended driver's license. Her driver's license apparently had been suspended because she had failed to pay a fine for littering.

{¶6} At the review hearing held shortly afterward, the trial court admonished Mother for failing to follow the specific conditions of her unsupervised visitation, but the court did not suspend her unsupervised visitation. On the weekend of April 29, 2022, Mother had another overnight visit with the children. Father M. was scheduled to pick up the children at her home the next day at

---

[1] Although the record includes references to Mother leading the police on a "high speed chase" with the children in the car, there is no police report or firsthand testimony in the record to support such a characterization of this incident.

6:00 p.m., but when he arrived at Mother's home, no one was there. Mother did not answer his calls, so he contacted the police and CSB. The CSB caseworker went to Mother's home and discovered that Mother, the children, and their belongings were gone.

{¶7} For the next three weeks, the children were missing. Mother did not contact Father M., CSB, the guardian ad litem, or any law enforcement authorities about the whereabouts or wellbeing of K.F. and/or D.F. In fact, when K.F. asked to call her father, Mother refused to allow her to use a telephone. Both children were missing school and D.F. was missing his regular counseling sessions and daily medication for his eyes. Mother would later admit that she made no attempt to contact law enforcement, or anyone involved with this case, and that she blocked Father M.'s phone number so that he could not get through to her cellular phone.

{¶8} On May 11, 2022, however, Mother had contact with someone else on her cell phone and law enforcement officials were able to detect her cell signal "ping" on a tower in Coral Gables, Florida. It was still another seven days before law enforcement authorities in Florida were able to locate Mother and the children, however. On May 18, 2022, police located the children, placed them with a children services agency in Florida, and Father M. drove down to Florida to retrieve them.

{¶9} Mother was charged with a felony offense for interfering with custody of her children and those charges remained pending throughout this case. The trial court also suspended her unsupervised visitation. Without any objection from Mother, the case plan was also amended to require Mother to obtain a psychiatric evaluation. Mother did not comply with that requirement throughout this case.

{¶10} After the children returned from Florida, the caseworker was unable to reach Mother for more than three months and Mother did not see the children during that period.

Following a review hearing on August 2, 2022, the trial court ordered that Mother's contact with the children be limited to supervised visits at the CSB visitation center. Shortly afterward, CSB began supervised visitation between Mother and the children at the agency's family interaction center. Mother's visits with the children remained closely supervised throughout this case.

{¶11} For an extended period during this case, Father C. also worked on the reunification goals of the case plan and progressed to unsupervised visits with his child, D.F. Things were going so well between the two that CSB filed a motion for the trial court to place D.F. in the legal custody of Father C. The agency later withdrew that motion, however, because Father C. apparently lost his housing and stopped communicating with the caseworker, the guardian ad litem, Father M., or the trial court.

{¶12} CSB ultimately moved for K.F. to be placed in the legal custody of her father, Father M.; and for D.F. to be placed in the legal custody of non-relatives, Father M. and M.P. Mother alternatively moved for the children to be placed in her legal custody or for a six-month extension of temporary custody. Father C. did not file a dispositional motion. The matter proceeded to a dispositional hearing before the trial judge. Mother appeared with her trial counsel. Father C.'s trial counsel appeared but Father C. did not. After the hearing, the trial court granted the final dispositional motions filed by CSB.

{¶13} Mother and Father C. appeal and each raise one assignment of error. This Court will address their assigned errors together because they both challenge the trial court's finding that placing the children in the legal custody of Father M. was in their best interest.

II.

## MOTHER'S ASSIGNMENT OF ERROR

THE [TRIAL] COURT ABUSED ITS DISCRETION IN FAILING TO APPLY
THE ENTIRE STATUTORY SCHEME TO ITS JUDGMENT ENTRY THUS

DEPRIVING MOTHER OF HER FUNDAMENTAL LIBERTY INTEREST IN HAVING HER CHILDREN'S CUSTODY.

### FATHER C.'S ASSIGNMENT OF ERROR

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT FOUND IT WAS IN THE BEST INTEREST OF [D.F.] TO GRANT LEGAL CUSTODY TO [FATHER M.] AND M.P. BECAUSE THAT DECISION WAS NOT IN THE BEST INTEREST OF THE CHILD, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND WAS NOT SUPPORTED BY A PREPONDERANCE OF THE EVIDENCE.

{¶14} Father C. and Mother challenge the trial court's decision to place D.F. in the legal custody of Father M. and M.P. Mother also challenges the trial court's decision to place K.F. in the legal custody of her father, Father M. On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence.

> Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶15} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶16} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. No specific test or set of criteria is set forth by statute regarding an award of legal custody, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23.

{¶17} "[T]he primary focus at the legal custody hearing was on the current parenting ability of each potential custodian and whether it was in the best interest of the children to be permanently placed in the legal custody of [either] of them." *In re K.C.*, 9th Dist. Summit Nos. 26992 and 26993, 2014-Ohio-372, ¶ 20. The juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17.

{¶18} Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, and the child's need for permanence. R.C. 2151.414(D)(1)(a)-(d); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16. R.C. 2151.414(D)(1)(e) also requires the trial court to consider whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply to this case, but those factors are not relevant here, and Mother does not argue otherwise. Although Mother does fault the trial court for failing to explicitly address the factors set forth in R.C. 2151.414(E)(7)-(11), there was no reason for the court to consider those factors if they did not apply to the facts of this case. *In re R.G.*, 9th Dist. Summit Nos. 30453 and 30454, 2023-Ohio-592, ¶ 33.

{¶19} The juvenile court may also apply the best interest factors in R.C. 3109.04(F)(1). *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While many factors overlap with those set forth in R.C. 2151.414(D)(1), separate factors that are relevant in this case are the children's adjustment to their "home, school, and community[]" and the proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(d),(f).

{¶20} On appeal, both parents assert that the trial court's best interest determination was not supported by the evidence presented at the hearing. Father C. argues that the trial court should have alternatively placed his child, D.F., in his legal custody or in the legal custody of Mother. Aside from arguing that the trial court failed to consider irrelevant R.C. 2151.414(D)(1)(e) factors, Mother does not articulate any argument to support her assigned error. In the interest of justice, however, this Court will address whether the trial court lost its way by failing to place D.F. in the legal custody of Father C.; by denying Mother's request for legal custody of both children; and by granting CSB's request to place K.F. in the legal custody of Father M. and to place D.F. in the legal custody of two non-relatives, Father M. and M.P.

**Father C.**

{¶21} For many months during this case, Father C. worked on developing a relationship with D.F. He began with supervised visits with the child, which eventually progressed to unsupervised, overnight visits in Father C.'s Cleveland home. CSB had initially supported legal custody of D.F. to Father C., but during December 2022, Father C. lost his housing, but those circumstances are not explained on the record. Father C. asserts in his brief that he had temporarily lost his housing and that the only obstacle to him receiving legal custody of the child was a "recent

housing issue[.]" No such argument was made on his behalf at the final dispositional hearing, however.

{¶22} Moreover, minimal evidence about Father C. was presented at the hearing. If Father C. desired to seek legal custody of his child, he had the burden of proving that such a placement was in the best interest of D.F. *In re M.B.*, 9th Dist. No. 30383, 2023-Ohio-1804, ¶ 17. Father failed to appear for the final dispositional hearing, and he had not visited D.F. for the past three months. Within the previous two to three months, Father C. had stopped communicating with CSB, the guardian ad litem, Father M. and M.P., the trial court, and his trial counsel. Trial counsel for Father C. appeared at the hearing, but he informed the court that he had not been able to reach Father C. to ascertain his wishes regarding custody at that time. At a minimum, Father C. should have appeared at the hearing and/or expressed his desire for legal custody to his trial counsel.

{¶23} No written or oral motion was before the court from Father C., and his whereabouts and/or ability to provide a home for D.F. were unknown. Consequently, Father C. has failed to demonstrate that the trial court lost its way by failing to award him legal custody of D.F.

**Mother**

{¶24} At the time of the hearing, Mother had not yet complied with the case plan requirement that she obtain a psychiatric assessment and follow all treatment recommendations, and the stability of her mental health remained a concern. Mother was also unavailable to take custody of the children at that time because she was incarcerated and awaiting resolution of the felony charges stemming from the incident of her taking the children to Florida. Moreover, D.F. told the guardian ad litem that he did not want to return to Mother's home and that he was scared

when she took the children to Florida. The guardian ad litem opined that returning the children to Mother was not in their best interest.

{¶25} The guardian ad litem, as well as other witnesses, expressed concern that Mother had repeatedly violated the court's visitation orders, which interfered with the parental rights of Father M. and potentially put the children at risk of harm. While Mother left and took the children to Florida, they missed three weeks of school and law enforcement officials began a nation-wide search for them. Mother admitted at the hearing that she did not call anyone involved with this case, she refused to allow K.F. to call Father M., and she blocked Father M.'s number on her phone. Mother never voluntarily returned the children to Ohio or Father M. The children ultimately returned to their placement in Ohio because law enforcement officials were able to locate Mother, take the children, and contact CSB and Father M.

{¶26} At the hearing, Mother did not express remorse for that incident or her repeated disregard of the terms of the trial court's visitation orders. She testified that she did not believe that she had caused the children any harm and that she had taken the children from Father M. to protect them from him. Throughout this case, Mother had insisted that Father M. and M.P. had treated the children and her inappropriately, but she presented no evidence to corroborate her concerns about these caregivers. CSB and the guardian ad litem had investigated Mother's complaints and found no reason to believe that Father M. or M.P. had behaved inappropriately with the children or Mother. The trial court ultimately concluded that Mother's negative testimony about Father M. and M.P. lacked credibility. Mother has not challenged that credibility determination on appeal.

{¶27} The guardian ad litem and other witnesses expressed concern that, if Mother were permitted to have unsupervised contact with the children, she might again violate visitation orders

and attempt to flee with them and/or prevent them from seeing their fathers. Mother had prevented the children from seeing their fathers before this case began. During this case, as explained already, Mother repeatedly violated visitation orders that she timely return the children to the home of Father M.

{¶28} After the children returned from Florida and Mother resumed supervised visitation with them, Mother continued to violate the conditions of her visitation time. The trial court had explicitly ordered Mother to have no contact with the children other than her scheduled supervised visits at the visitation center. Nevertheless, Mother once went to D.F.'s bus stop and spoke to him while he waited for the bus. D.F. reported being uncomfortable during that interaction. Also, after one of Mother's scheduled visits was cancelled because she arrived late at the visitation center, Mother made an unauthorized and unannounced appearance at the home of Father M. and M.P., demanding to see the children. A physical altercation ensued between Mother and M.P. when Mother tried to force her way into the home.

### Father M. and M.P.

{¶29} On the other hand, the trial court had substantial evidence before it to support its conclusion that Father M. and M.P. had been providing appropriate care for the children, that they were willing and able to continue doing so, and that they were committed to facilitating a relationship between the children and their noncustodial parents. Aside from Mother's concerns about the suitability of Father M. and M.P. as caregivers, which the trial court did not believe, Mother and Father C. have failed to support their arguments that the trial court's decision was not supported by the evidence. Although Father C. notes that M.P. was not working at the time of the hearing, Father M. had stable, fulltime employment and his income was sufficient to meet the family's financial needs.

**{¶30}** Both Father and M.P. had been approved by CSB before the children were placed in their home. They had been together as a couple for several years and had no criminal history or mental health or substance abuse problems. At the time of the hearing, the children had been living in their home for two years and had adjusted well to living there. Aside from Mother, no witnesses had any doubt that the children were thriving in that home. They were happy, had become closely bonded to the entire family, were involved in activities, and were doing very well in school.

**{¶31}** Father M. and M.P. both testified at the hearing. They understood that it was important for the children to maintain parental relationships with Mother and for D.F. to maintain a relationship with Father C. They had facilitated parental visitation during this case and planned to continue doing so. The caseworker and guardian ad litem both agreed that Father M. and M.P. would continue to respect the parents' residual parental rights and believed that it was in the children's best interest to be placed in their legal custody.

**{¶32}** Mother and Father C. have failed to demonstrate that the trial court lost its way by placing K.F. in the legal custody of Father M. or by placing D.F. in the legal custody of Father M. and M.P. The assignments of error of Mother and Father C. are overruled.

III.

**{¶33}** The assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETTY SUTTON
FOR THE COURT

CARR, J.
STEVENSON, J.
CONCUR.


APPEARANCES:

ALEXANDRA HULL, Attorney at Law, for Appellant.

JAYSEN W. MERCER, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

RYAN KINNEY, Attorney at Law, for Appellee.

MICHELLE ANN TOMER, Attorney at Law, for Appellee.

BETH BLACKMORE, Guardian ad Litem.