[Cite as *In re R.D.*, 2024-Ohio-2153.]

STATE OF OHIO        )
                               )ss:
COUNTY OF SUMMIT    )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: R.D.

C.A. No.      30911

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 19 04 0318

DECISION AND JOURNAL ENTRY

Dated: June 5, 2024

STEVENSON, Presiding Judge.

{¶1} Appellant, L.R. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her minor child in the legal custody of the child's paternal grandparents ("Grandparents"). This Court affirms.

I.

{¶2} Mother is the biological mother of R.D., born April 9, 2019. In the trial court, the child's father ("Father") expressed agreement with Grandparents receiving legal custody. On appeal, Father filed a brief in support of the trial court's judgment.

{¶3} Summit County Children Services Board ("CSB") originally opened this case on April 12, 2019, when R.D. was three days old. The agency filed a complaint to allege that R.D. was a neglected and dependent child because Mother tested positive for amphetamines and methamphetamines when R.D. was born and was not providing proper care for the child in the hospital; Mother came to a team decision meeting appearing to be under the influence of drugs;

she had lost legal custody of an older child in a juvenile case in another county; and she had a history of mental health problems and criminal convictions. The complaint also alleged that Father had a history of substance abuse problems. CSB obtained emergency temporary custody of R.D. and placed him in the home of Grandparents after he was released from the hospital.

{¶4} Mother and Father waived their rights to contested adjudicatory and dispositional hearings and the juvenile court adjudicated R.D. a neglected and dependent child, placed him in the temporary custody of CSB, and adopted the case plan as an order of the court. In addition to demonstrating that they could provide for the child's basic needs, the case plan required the parents to address their substance abuse and mental health problems.

{¶5} Each parent obtained a combined substance abuse and mental health assessment but failed to engage in the recommended counseling and continued to actively use drugs. Consequently, CSB later moved for R.D. to be placed in the legal custody of Grandparents. Both parents waived their rights to a contested dispositional hearing and agreed that the child should be placed in the legal custody of Grandparents.

{¶6} On June 18, 2020, the trial court placed R.D. in the legal custody of Grandparents and granted the parents supervised visitation as agreed by the parties. The order further provided that the parents' visitation would be supervised until the custodians believed that supervision was no longer necessary; and that, if the parties could not agree on a visitation schedule, either parent could file a motion to modify visitation. The trial court closed the case, subject to the court's continuing jurisdiction under R.C. 2151.353(F)(1).

{¶7} On June 6, 2022, Mother moved in the same trial court case to modify her visitation time. She implied that she had achieved sobriety but was not yet receiving unsupervised visitation time with R.D. Mother explicitly requested that she be permitted to spend "alone time" with R.D.

and to "take him to do fun things"[.]" She stated that she had enrolled in parenting classes, was involved in a church group, and that she would provide urine samples to demonstrate that she was sober. On July 22, 2022, Mother and Grandparents appeared for a status hearing. They agreed that Mother had demonstrated a period of sobriety and that she would begin having unsupervised visits with R.D.

{¶8} On October 18, 2022, a status hearing was held before a magistrate, but Mother was the only party to attend. According to the magistrate's status hearing order, Mother reported that, when she recently picked up R.D. from Grandparents' home for a visit, she observed drug paraphernalia in their home. Mother told the magistrate that she believed that Father and Grandparents were "actively using methamphetamine" in the home and that Grandparents were permitting Father to have unsupervised contact with R.D. The order further indicated that the magistrate would be making a referral to CSB to investigate Mother's allegations and that a representative from CSB would attend the next status hearing. Prior to the next hearing, Mother filed a motion for emergency custody of the child.

{¶9} The details about CSB's investigation into Grandparents' alleged drug use are not set forth in the record except that Grandparents voluntarily provided drug swabs to CSB, which tested positive for methamphetamine. It is not clear from the record whether Grandparents had used methamphetamine or had been exposed to drug residue left in their home by Father, who admittedly used methamphetamine and often visited their home. Nevertheless, because of Grandparents' positive drug tests, the trial court found that a change had occurred in the circumstances of the child and/or Grandparents. The court terminated the 2020 legal custody order and found that, at that time, it was in the best interest of R.D. to be placed in the temporary custody of CSB. *See* R.C. 2151.42(B) (permitting the modification or termination of a final legal custody

order only upon the finding of such a change and that a different dispositional order is in the best interest of the child). The trial court placed R.D. in the temporary custody of CSB and the agency placed him in the home of a different relative for the next several months.

{¶10} Grandparents obtained substance abuse assessments, which were not entered into evidence in the trial court. According to the caseworker, however, the professional who conducted the evaluations concluded that neither grandparent had a substance abuse problem or a need for drug treatment. Grandparents submitted samples for drug testing for the next several months and consistently tested negative for any substances. After R.D. remained outside their custody for approximately nine months, CSB returned the child to their home. The trial court later placed R.D. in Grandparents' temporary custody under an order of protective supervision by CSB.

{¶11} Because the child adjusted well to returning to Grandparents' home and CSB had no concern about the suitability of Grandparents as the child's caregivers, CSB later moved the trial court to place R.D. in the legal custody of Grandparents and to terminate the agency's protective supervision. The case proceeded to a final dispositional hearing before the trial judge. Father and the guardian ad litem supported CSB's motion for R.D. to be returned to the legal custody of Grandparents, while Mother alternatively sought legal custody of R.D.

{¶12} Following the hearing, the trial court found that it was in the child's best interest to be returned to the legal custody of Grandparents. Consequently, it placed R.D. in the legal custody of Grandparents, terminated the order of protective supervision, and closed the case. Mother appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT-MOTHER'S MOTION FOR LEGAL CUSTODY [AS THAT

JUDGMENT WAS] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13} Mother's sole assignment of error is that the evidence did not support the trial court's decision to place R.D. in the legal custody of Grandparents rather than in her legal custody. An award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence.

> Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶14} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶15} Mother asserts that, as a parent, she has a fundamental right to raise her child. She begins her argument by citing case law that requires a court to first find a parent unsuitable before it is authorized to place a child in the legal custody of a non-parent. *See*, *e.g.*, *In re Hockstock*, 98 Ohio St.3d 238, 2002-Ohio-7208, syllabus. That line of case law involves custody disputes between a non-parent and a presumptively fit parent, however. It is well established that, because

R.D. was previously adjudicated a neglected and dependent child in this case, that adjudication implicitly established his parents' unsuitability. *See In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, paragraph two of the syllabus. Consequently, when the trial court considered the dispositional alternatives of placing R.D. in the legal custody of Mother or Grandparents, it was not required to again find that Mother was unsuitable before placing the child in the legal custody of Grandparents.

{¶16} The remainder of Mother's argument focuses primarily on evidence that she is sober, has achieved stability in her life, and is now able to provide R.D. with a suitable home. The trial court commended Mother for the "remarkable strides" that she had made since the beginning of this case by achieving sobriety, developing a support system of family and her church community, and by obtaining suitable employment and housing. For that reason, the trial court granted Mother significantly more visitation rights than it had when R.D. was placed in Grandparents' legal custody in 2020.

{¶17} In the October 2023 legal custody judgment now on appeal, the trial court ordered that Mother's "liberal" visitation rights "shall progress to overnight and extended visits as [R.D.] becomes more comfortable." The trial court's judgment further provided that, after Mother progressed to overnight visits, she would have visitation under the standard order. The trial court also scheduled a review hearing for the end of the following month "for the purpose of confirming that Mother's visitation advances in an expeditious manner."

{¶18} The fact that Mother had improved her parenting ability during the past few years, however, was not the legal standard that the trial court was required to apply when it ruled on the competing motions for legal custody. The progress that Mother had made between the closing and reopening of this case was akin to case plan progress during an open case. While relevant, case

plan progress is not dispositive of the trial court's legal custody decision. *See In re M.B.*, 9th Dist. Summit No. 30383, 2023-Ohio-1804, ¶ 15. Instead, "[f]ollowing an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. No specific test or set of criteria is set forth by statute regarding an award of legal custody, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23.

{¶19} The juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, and the child's need for permanence. R.C. 2151.414(D)(1)(a)-(d); *see also In re B.C.*, 9th Dist. Summit Nos. 26976 and 26977, 2014-Ohio-2748, ¶ 16. R.C. 2151.414(D)(1)(e) also requires the trial court to consider whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply to this case, but those factors are not relevant here.

{¶20} The juvenile court may also apply the best interest factors in R.C. 3109.04(F)(1). *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850 and 15CA010860, 2017-Ohio-1, ¶ 17. While many factors overlap with those set forth in R.C. 2151.414(D)(1), separate factors that are relevant in this case are the child's adjustment to their "home, school, and community[]" and the proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(d),(f).

{¶21} In applying the required best interest factors, the trial court considered evidence about the child's interaction and interrelationships with each prospective custodian. Mother emphasizes evidence that she and R.D. have a good relationship and interact well together. The trial court considered that evidence but also considered that R.D. had never lived at Mother's home but had lived with Grandparents for most of his life. The evidence was undisputed that R.D. was closely bonded with Grandparents and felt more comfortable in their home.

{¶22} After his nine-month removal from Grandparents' home, R.D. was apprehensive about going to Mother's home for visits because he feared he would not return to Grandparents' home. During his initial visits to Mother's home, R.D. threw tantrums, vocalized his concerns, and even physically refused to get out of the car and/or walk into Mother's home. Through counseling, and with continual assurances from Grandparents that he would return home after each visit, R.D. gradually became more comfortable visiting Mother's home. Because R.D. was not ready to spend the night at Mother's home, his counselor recommended that his visits progress to overnight visits when he felt more comfortable there.

{¶23} Although Mother testified that she believed that Grandparents had been using methamphetamine for many years and that they continue to use and sell the drug, the trial court explicitly found that Mother's testimony was not credible. Again, it is unclear from the record why Grandparents had tested positive for methamphetamine after Mother alleged that they were using drugs, but the caseworker and the guardian ad litem both testified that they had never observed any indication through Grandparents' behavior or the condition of their home that they used drugs. The guardian ad litem testified that she had never seen signs of drug use in their home even when she looked through drawers and cabinets.

{¶24} The caseworker further testified that Grandparents had submitted 12 drugs screens since the positive tests that caused the court to remove R.D. from their home. Those tests had consistently ruled out any drug use and the caseworker had no concerns that Grandparents were using drugs. The caseworker further testified that Grandparents were meeting the basic needs of R.D. and that the child felt at home there.

{¶25} Because R.D. was only four and a half years old at the time of the hearing, the guardian ad litem spoke on his behalf. She opined that it was in the best interest of R.D. to be placed in the legal custody of Grandparents. She emphasized that R.D. had lived with Grandparents for almost four years of his young life and considered their home to be his home.

{¶26} The guardian ad litem further testified that, although R.D. likes to spend time with Mother, he was not ready to spend the night at Mother's home, let alone live there. She also praised Mother for stabilizing her life and achieving sobriety, but expressed concern that Mother was risking her sobriety by pursuing a reunification with Father, who continues to use drugs.

{¶27} R.D.'s custodial history had included living in the home of Grandparents for nearly four years. While he was removed from their custody during this reopened case, R.D. lived with another non-parent relative. R.D. has never lived in Mother's custody. Because he had been uprooted from Grandparents' home for several months, which caused him emotional turmoil, he needed the stability of a permanent placement. The trial court reasonably concluded that placing him in the legal custody of Grandparents would provide him with a legally secure permanent placement.

{¶28} Finally, the trial court considered whether Grandparents would be likely to facilitate visitation between the parents and R.D. Grandparents testified and each expressed a willingness to honor the parents' residual parental rights and facilitate visitation as court-ordered and

appropriate. They would supervise Father's visits and continue to allow Mother to have unsupervised and expanded visitation with R.D.

**{¶29}** Given the evidence presented at the final dispositional hearing, Mother has failed to demonstrate that the trial court lost its way in determining that legal custody to Grandparents was in the best interest of R.D. *See Eastley* at ¶ 20. Mother's assignment of error is overruled.

III.

**{¶30}** Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

HENSAL, J.
SUTTON, J.
<u>CONCUR.</u>

<u>APPEARANCES:</u>

JASON JORDAN, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

ALEXANDRA HULL, Attorney at Law, for Appellee.

HANK MEYER, Attorney at Law, for Appellees.

ANNETTE POWERS, Guardian ad Litem.